THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CARL BURNS, Defendant-Appellant.

Fourth District   No. 16828

Opinion filed July 14, 1981.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Edward Litak, State's Attorney, of Danville (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE TRAPP delivered the opinion of the court:

Defendant was convicted of rape by jury trial and sentenced to 6 years' imprisonment. On appeal he contends that (1) evidence of flight was improperly admitted against him, and (2) a picture of the complaining witness, Georgia Seward, was improperly admitted into evidence.

We affirm.

Georgia Seward, the victim, testified that she went with a friend, Evelyn Keys, to a tavern called "Jimmy Harold's" at about 11:30 p.m. on Friday, April 11, 1980. There defendant approached Seward, and she spoke with him for about 10 minutes. Seward had previously seen defendant on three or four occasions within the previous three weeks. Seward left this tavern and rode with another man to a tavern called "The Every Now and Then Club." She talked with defendant at the Every Now and Then Club for approximately one hour.

Seward and defendant left the club together and were subsequently given a ride to Seward's house by Bill Ellis. Seward testified that during the ride the defendant kept asking her if he could come inside her house. She told him no at first, but then finally said it would be okay if the defendant came in for a few minutes.

Seward stated that she lived in a house in Danville, Illinois, with her daughters, and that on that night another young girl, Yolanda Keys, was staying with her daughters.

Once inside Seward's home she and the defendant sat on the couch talking for about 15 minutes. Seward testified that the defendant began choking her after she told him she was ready to go to sleep. She stated that

defendant choked her for about 10 to 15 minutes, and while choking her defendant kept asking if she was "going to give it up." Seward could not speak while the defendant choked her, and she stated that her eyes felt like they were going "to pop out of [her] head." Seward felt she was blacking out and then nodded her head, agreeing to have intercourse with the defendant.

Seward testified that she only had intercourse with the defendant once and that after that act of intercourse the defendant said that he was sorry for what he had done, and that "he had never did a lady like that before." Seward told the defendant that she would forget about it if he would leave. The defendant jumped up and told her that he was not through with her yet. At that point Seward ran toward the back of the house and yelled for her children. Defendant left, according to Seward, when the children came out of their rooms.

After the defendant left, Seward testified that she went to bed. She noticed that her face was swollen and had red spots on it, and that the pupils of her eyes were completely red. Seward stayed in her house the entire day. Evelyn Keys visited Seward at her home at about 8:30 that evening and took Seward to the police station and the hospital. Seward stated that she did not report this incident to the police for approximately 18 hours because she was afraid.

Officer Mark Forsythe testified that he spoke with Seward in connection with this offense and photographed her. He identified People's Exhibit No. 1 as a photograph of Seward taken on April 12, 1980. At that time Forsythe noted that both of Seward's eyes were red.

Dr. Seungdamrong testified that at approximately 11:30 p.m. on Saturday, April 12, 1980, he examined Georgia Seward in the emergency room of a hospital in Danville. Seungdamrong stated that he observed redness in the white part of Seward's eyes which he stated was called a subconjunctival hemorrhage. He stated that the cause of that condition could be either a direct injury to the eye itself or a result of coughing profusely. Seungdamrong then stated that the only causes of the condition were those just mentioned. On cross-examination Seungdamrong stated that the causes could be a direct blow to the eye or something that causes an increase in blood pressure such as persistent coughing.

Teresa Seward, Georgia Seward's 7-year-old daughter, after being qualified to testify, stated that her cousin, Yolanda, spent the night at her home and that during the night she heard her mother call her name, her sister's name and her cousin's name. Teresa said that the three girls went into the front room and that there was a man in the front room whom her mother told to leave and who then left. Teresa stated that her mother's face was swollen and her eyes were red the day after this incident.

Yolanda Keys, who was 11 years old, and Rockelle Seward, Georgia's

other daughter, who was 7 years old, also testified and essentially corroborated the testimony of Teresa Seward. Yolanda stated that Georgia Seward's eyes were red the day after the incident while Rockelle Seward stated that her mother's eyes had black circles around them. None of the three girls identified the defendant as the man whom they saw in the house that evening.

Evelyn Keys testified that she went with Georgia Seward to "Jimmy Harold's" at approximately 11 p.m. on April 11, 1980. She and Seward did not leave the tavern together, and Keys testified that she went to Seward's home the next day at approximately 8 or 8:30 p.m. At that time Keys stated that the white part of Seward's eyes were red and there were red spots around her face. Keys took Seward to the police station and then to the hospital.

The State tendered its exhibit No. 1, the picture of Seward taken the day after the incident, which was admitted into evidence without objection.

Three defense witnesses testified that they saw defendant and Seward together at either Jimmy Harold's or at the Every Now and Then Club on the night in question.

The defendant testified on his own behalf. Prior to his testimony, defense counsel argued that the prosecutor should not be allowed to cross-examine defendant with respect to an auto theft which occurred the evening following the incident. The trial court stated that the prosecutor would be allowed to cross-examine the defendant "with regard to the elements of flight," but specifically limited the prosecutor, stating that he was not to refer to the theft of the automobile.

The defendant testified that he was playing records at Jimmy Harold's when Seward approached him and asked him his name and whether he had any plans for later in the evening. The defendant told Seward that he was going to the Every Now and Then Club. Seward said, "Good. I'll be there." The defendant stated that when he arrived at the club Seward was already there and she called him over to her table. Defendant ordered a drink for Seward and they also danced.

Defendant stated that he and Seward left the bar at approximately 2 a.m. and that they rode to Seward's home with Ellis and several other people. Defendant stated that he and Seward sat on the couch and that he told Seward that he had recently found a job and could possibly help her with her family and financial problems. Seward started crying, and the defendant stated that he then kissed her and they had sexual intercourse. The defendant then talked to her and engaged in intercourse a second time. During intercourse defendant stated that although he was not paying particular attention to her eyes, he noticed that they were not red or swollen. Defendant could not explain how Seward received her injuries. Defendant testified that Seward became angry after the defend-

ant criticized her for leaving her children at home alone. Defendant stated that he gave Seward $10 and then left the house.

Defendant testified that the only time he saw Seward's children was when he looked into their room and saw them asleep in bed. The defendant did not hear the children screaming at any time that evening.

On cross-examination the defendant stated that he left Seward's apartment at approximately 5 a.m. Saturday morning and that he first learned of Seward's complaint when he was arrested late Sunday evening in Indiana. He admitted that when he was arrested he was heading east, away from Danville.

During redirect examination, defendant testified that when he was arrested he was on his way to Indianapolis, Indiana, to borrow money from his youngest sister to help out his brother with whom he lived. He also testified that on the previous Thursday he had told Robert Echols and Paul Randle that he needed to go to Indianapolis and discussed with them making the trip to Indianapolis to get some phonograph records.

After this testimony the trial court stated that its prior restrictions on the testimony regarding the theft were removed. Defendant then admitted that although he had planned the trip with Echols and Randle he left alone on Sunday morning at about 1 a.m. and took Echols' car, without his permission, to make the trip.

On redirect examination the defendant admitted that he had been found guilty of the theft of Echols' car, as well as the theft of another car, and the court subsequently took judicial notice of defendant's theft conviction in Indiana.

Defendant contends that the evidence that he had stolen an automobile and left the State 18 hours after the alleged offense occurred was improper evidence of flight and that therefore the defendant was denied a fair trial.

Flight has been defined by the supreme court as:

> " 'the evading of the course of justice by voluntarily withdrawing oneself in order to avoid arrest or detention, or the institution or continuance of criminal proceedings. The term signifies, in legal parlance, not merely a leaving, but a leaving or concealment under a consciousness of guilt and for the purpose of evading arrest. Such consciousness and purpose is that which gives to the act of leaving its real incriminating character.' " *People v. Herbert* (1935), 361 Ill. 64, 73-74, 196 N.E. 821, 825.

Defendant asserts that before evidence of flight could properly be admitted against him the State was required to produce evidence which demonstrated that he knew he was wanted by the police. Defendant testified that he first learned of Seward's complaint when he was arrested

in Indiana and that there is no contradictory testimony to support an inference that he had knowledge that he was being sought by the police. He contends that proof of such knowledge is required as a foundation to the admission of evidence of flight.

Defendant cites two opinions, each entitled *People v. Harris—People v. Harris* (1961), 23 Ill. 2d 270, 178 N.E.2d 291, and *People v. Harris* (1972), 52 Ill. 2d 558, 288 N.E.2d 385. Each is so distinguished upon the facts that they are inapposite here. In the first, defendant was convicted of burglary. The opinion notes that there was no admissible identification of defendant. Upon the issue of flight the evidence was that the defendant escaped from jail while in custody upon an unrelated charge. Upon such facts, the court determined the evidence of escape was not admissible, saying:

"It does not appear, however, that the defendant knew that he was suspected of the Eberhardy burglary. The inference of guilt that may be drawn from flight depends upon the knowledge of the culprit that the crime has been committed and he is or may be suspected. Here the record indicates that the defendant came to the Evanston police station and voluntarily surrendered himself in connection with an unrelated charge of assault." 23 Ill. 2d 270, 273, 178 N.E.2d 291, 293.

In the later *Harris* opinion, defendant was observed to be speeding. When a police squad car attempted to stop him defendant drove away at high speed to elude the officers. Defendant was convicted of the possession of narcotics found when he was finally caught. Defendant offered no evidence. He argued that the evidence of flight was prejudicial and inadmissible because at the time of the arrest he was being sought on an armed robbery charge and that his flight was motivated by such fact. The court rejected the argument, saying:

"Evidence of flight is admissible as a circumstance tending to show consciousness of guilt. *People v. Wright,* 30 Ill. 2d 519; *People v. Autman,* 393 Ill. 262. The record does not contain evidence to show that defendant attempted to flee for any reason other than consciousness of guilt of the offence of which he was convicted. *State v. Green* appears to be authority for the proposition that when a defendant is in custody on two or more charges, his escape is not relevant to the question of his guilt on any of them, but that is not the factual situation presented in this record." 52 Ill. 2d 558, 561, 288 N.E.2d 385, 387.

The facts here are immediately distinguishable from the facts in the cited opinions, for defendant was not in custody upon, or under, charges in unrelated offenses at the time he left the State. The record shows that defendant was aware of the present offense, for he testified to the fact of

being present with the victim, and he knew that he could be satisfactorily identified. The testimony of the complaining witness concerning her resistance and defendant's use of force provide a reasonable inference that the defendant was aware that she would or might claim that a rape had occurred.

■■■ The contention here made by defendant was rejected in *People v. Wilson* (1980), 87 Ill. App. 3d 693, 409 N.E.2d 344, *appeal denied* (1981), 82 Ill. 2d 587, and *People v. Tillman* (1969), 116 Ill. App. 2d 24, 253 N.E.2d 873. In *Wilson*, the court stated:

> "However, while evidence that defendant was aware that he was a suspect is essential to prove flight (*People v. Herbert* (1935), 361 Ill. 64, 196 N.E. 821), actual knowledge of his possible arrest is not necessary to render such evidence admissible where there is evidence from which such fact may be inferred. *Griffin; People v. Torres* (1977), 53 Ill. App. 3d 171, 368 N.E.2d 361." (87 Ill. App. 3d 693, 699, 409 N.E.2d 344, 348.)

Upon the authorities cited and the facts of record here, there was no error by the trial court in admitting the evidence of flight.

The defendant also asserts that the photograph of Seward taken on April 12, 1980, People's Exhibit No. 1, was improperly admitted into evidence. The State asserts that any error in the admission of this photograph into evidence has been waived, as the defendant did not object to its admission. Although defendant did not object when the photograph was initially admitted into evidence, the defendant did object, at the jury instruction conference, to the photograph being given to the jury to take with them to the jury room. Defendant also included this as an issue in his post-trial motion.

■■ It appears from the record that the jury did not see the picture at the time of its admission into evidence. Thus, by objecting to the photograph prior to closing arguments defendant presented the court with an opportunity to correct the alleged error prior to the jury seeing the photograph, and therefore prior to the time at which the prejudice to defendant would occur. Defendant's counsel did not seek to gain advantage by her failure to act, and we find defendant has not waived this issue. *People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233, 239.

■■ On the merits, however, we find that the trial court did not abuse its discretion by admitting the photograph into evidence. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 143, 402 N.E.2d 238, 245.) The defendant contends that the photograph of Seward should not have been admitted since there was no evidence linking the defendant's actions to Seward's physical condition. The defendant bases his argument on the fact that Dr. Seungdamrong did not expressly testify that the redness in Seward's eyes could have been caused by defendant's actions in choking her. Seungd-

amrong specifically stated two possible causes of Seward's injuries the first being a direct injury to the eye and "the other one [cause] is from something that increases the blood pressure in the upper part of the body such as severe cough or persistent cough."

Seward testified that the defendant choked her for 10 to 15 minutes. This evidence was sufficient to create a jury question as to the cause of the redness of Seward's eyes. The jury, relying upon their common experience, could find that choking increases one's blood pressure and could reasonably conclude on that basis that defendant's choking of Seward caused her physical condition. There was a sufficient nexus between the doctor's testimony as to the possible causes of Seward's condition and the actions of defendant to support the admission of the photograph into evidence.

Affirmed.

GREEN and WEBBER, JJ., concur.