THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DARRYL MIMS a/k/a Darryl Williams, Defendant-Appellant.

First District (2nd Division)   No. 81—918

Opinion filed December 28, 1982.—Rehearing denied January 31, 1983.

Steven Clark and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean P. Karlos, and Harry John Devereux, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Darryl Mims, appeals his conviction by the circuit court, sitting without a jury, of murder and two counts of armed robbery stemming from the murder of Sherman Hall, a customer in a tavern, shortly after midnight on September 15, 1980. He presents as issues whether: (1) the circuit court erroneously denied his motion for a continuance moments before the trial was to begin; (2) the State's failure to inform him that one of the arresting officers would repudiate a portion of his police report at trial was prejudicial to his case; (3) assistant State's Attorneys assigned to the felony review division must make written summaries of the initial statements given them by occurrence witnesses; and (4) the extended-term sentences he received for armed robbery were improper.

Mims and Joseph Mahogany were charged with murder, attempted murder, attempted aggravated kidnaping, armed robbery, aggravated battery and armed violence in connection with their alleged involvement in a robbery and murder which occurred in the tavern located near the intersection of Marquette, May and 67th Street in Chicago.[1]

The State's witnesses testified that Mims and Mahogany entered the tavern shortly before midnight and sat a distance away from the small group of "regular" customers. The two ordered some beer. Mims made a telephone call and then the two ordered another two beers. Later, when Kattie Simmons, the barmaid, had her back to the bar and was ringing up the cash register she heard Mims and Mahogany both call out in a loud voice: "This is a stick-up. Put your hands on the bar." As she turned around, she heard a gunshot and saw Hall, the victim, fall to the ground. She dropped to the floor behind the bar. Mahogany walked around the bar, grabbed her, and demanded to know where the owner's gun was. She heard Mims demanding to know what the other customers had in their pockets. John Patterson, a customer, testified that one defendant held a gun to the back of his neck while he was lying on the floor and took money out of his pockets. Lewis Williams, another customer, testified that the man later identified as Mims took his (Williams') wallet out of his pocket. One of the defendants asked Simmons how to open the cash register. She told him and heard the register ring open.

As Mims and Mahogany were preparing to leave, one of them realized that the police had arrived and called out to his partner to grab Simmons and use her as a hostage, which he did. Simmons did not

---

[1] Mahogany is not involved in this appeal.

open her eyes until she was outside. When she did, she saw a squad car in front of the tavern and then heard bullets whizzing past her. Three bullets struck her.

Police Officer Virgil Jones testified that Mims came out of the tavern, crouched, and shot at him. Jones fired back, and he saw a gun fall "from him." The parties later stipulated that, according to a fire-arms expert, this gun had never been fired. On cross-examination, Jones testified that he had transposed defendants' names in his report. Police Officer Gregory Stevenson, Jones' partner, testified that he saw the tavern door open, two male Negroes in the doorway, one crouching, and saw the door close. The door reopened and he saw a lady being forced outside with a gun being held to her head, heard two shots and saw a muzzle flash coming from the man, later identi-fied as Mahogany, who had been holding the gun to the woman's head.

Sergeant James Ivory testified that he arrived at the scene after the two other officers. He entered the tavern wielding a shotgun, and called for anyone in the rear storeroom to come out. The two defend-ants emerged, Mims supporting Mahogany. Mahogany reached leftwise across his body toward his waistband and Ivory fired the shotgun. Both defendants fell.

Mims testified in his own behalf. As he was waiting for a bus at 69th and Racine between 11:30 and 12 o'clock on the evening in ques-tion, he saw Mahogany, started talking and walking with him to 64th and Racine. As they were walking past the subject tavern, Mahogany suggested that they stop in and have a drink. Mahogany ordered a beer; Mims nothing. Mahogany walked to the back of the tavern and started shooting craps on the pool table with others, while Mims tele-phoned his mother. When finished talking, Mims saw Hall walk into the tavern, approach Mahogany, and argue with him. Hall broke off the argument, threw his hands up in the air "like he didn't want to be bothered" and started walking away from Mahogany toward the bar. Mahogany walked up behind, told Hall to "freeze," and shot him in the back.

Moments later, a woman at the bar called out that the police were outside. Williams then tried to calm down Mahogany, who was about to panic, and told Simmons to go over to the door and call in the po-lice. As she started to the door, Mahogany ran up behind her, grabbed her, and pushed her out. Mims heard the sound of guns firing outside and saw Mahogany come back inside and run to the back. He heard the police announce that they had the place surrounded. Mims pleaded with Mahogany to give up. The police burst into the tavern a few

minutes later. When they came in, Mims had his arm around Mahogany, who was bleeding. As the police approached them, Mahogany suddenly bent down and turned to his right at which point the police shot them both.

The court found Mims guilty of murdering Hall and guilty of two counts of armed robbery.

I

Mims contends that the circuit court did not permit him to fully articulate why he wanted to retain private counsel to represent him and argues, without citing authority, that he has a right to make such a motion as late as the time when his trial was about to commence. He notes that several State and Federal courts have recognized that criminal defendants have the right to explain to the court why they desire new counsel to represent them, citing *Monroe v. United States* (D.C. App. 1978), 389 A.2d 811, and *Brown v. Craven* (9th Cir. 1970), 424 F.2d 1166. Mims' argument is not persuasive for several reasons: The circuit court appointed Nicholas Iavarone, an experienced criminal lawyer, to represent Mims in light of the severity of the charges that had been brought against him. When Iavarone informed the court that Mims "[did] not want to go to trial," just moments after having announced that he and his client were ready to proceed, the court responded:

"THE COURT: He is asking for a continuance, in other words?

MR. IVARONE:[2] Yes, Judge.

THE COURT: What are the grounds for the continuance? What are your grounds for continuance, Mr. Ivarone?

MR. IVARONE: He feels that he would be able to do much better with an attorney, if his family can raise the money to hire a private attorney. Therefore, he would like an opportunity to hire private counsel.

THE COURT: Motion for continuance as to Mr. Williams [Mims] is denied.
       * * *
DEFENDANT WILLIAMS [MIMS]: I couldn't even get a private attorney?

THE COURT: You have a private attorney.

MR. WILLIAMS [MIMS]: I don't have anything against Ivarone or anything, but I seriously feel I could have been bet-

---

[2]So spelled in the transcript.

ter than—

THE COURT: Mr. Williams [Mims], I wouldn't make any comment on that. You have an attorney who is skilled in the practice of criminal law. I see no reason at this juncture after you have properly, I think, demanded trial that on the moment of the trial, not the eve of trial, to grant your continuance and it is denied.

\* \* \*

MR. WILLIAMS [MIMS]: Reason, like I say I feel I can do better than this with his case.

\* \* \*

[THE COURT]: Mr. Ivarone is your lawyer and will remain your lawyer. Is that clear to you?"

The first reaction of the court, therefore, was not to peremptorily deny Mims' request, but to ascertain why Mims wanted a continuance. Iavarone explained why. Mims did not disagree with Iavarone's explanation, in fact, he later restated it in his own words when he said: "I don't have anything against Ivarone or anything \* \* \*." The circuit court did not find Mims' explanation adequate.

■ The decision to grant or deny a motion for a continuance lies in the sound discretion of the court (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(e); *People v. Friedman* (1980), 79 Ill. 2d 341, 347, 403 N.E.2d 229). The motion may be granted if the "interests of justice" so demand (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(d), (f)), bearing in mind the right of the defendant and the State to a speedy, fair and impartial trial (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(h)). In *Friedman*, after trial had been set 2½ months earlier to allow defendant to retain private counsel if he chose, on the trial date defendant asked to be represented by private counsel, a lawyer who would not have been able to begin preparing for trial until late the following week. Friedman stated that he was displeased with his appointed attorney's performance and had no faith in his ability to represent him. The circuit court denied his motion for a continuance and the supreme court affirmed on this point, although the case was reversed and remanded on other grounds. Mims' situation is less compelling, since he articulated no acceptable reason for desiring new counsel and was already being represented by an experienced, court-appointed criminal lawyer. (See also *People v. Heath* (1976), 35 Ill. App. 3d 880, 342 N.E.2d 452; *People v. Williams* (1973), 14 Ill. App. 3d 572, 303 N.E.2d 575.) Defendant must show the court's refusal to allow him additional time to find other counsel prejudiced him in some way (see *People v. Solomon* (1962), 24 Ill. 2d 586, 589-90, 182 N.E.2d 736), a factor absent in this

case. We find no error.

## II

■ The State failed to inform Mims that Officer Jones intended to testify that Mims had shot at him outside the tavern, which defendant claims requires that his case be reversed and remanded for a new trial. He asserts that Jones' testimony in this regard tended to establish that he and Mahogany had acted in concert with respect to the armed robberies and murders which had allegedly occurred inside the tavern that evening. Jones' testimony, however, related only to what happened at the tavern after the alleged murder and armed robberies had already occurred. Simmons, Patterson and Williams witnessed and testified as to these crimes, which evidence implicated him and upon which he was convicted, not that given by the police.

Mims quotes language from *People v. Burgin* (1979), 74 Ill. App. 3d 58, 392 N.E.2d 251, and contrasts that case with his. In *Burgin*, the girl who had been raped testified at a preliminary hearing that Burgin had said to her, "Let me get on you for five minutes." (74 Ill. App. 3d 58, 61.) The court reporter mistakenly transcribed her testimony as "How about you getting on for five minutes." (74 Ill. App. 3d 58, 71.) Defense counsel had apparently intended to impeach the girl's testimony at trial with this testimony by suggesting that Burgin had simply invited her to go for a ride with Burgin on his bicycle and that she had misconstrued his words. The State's Attorney handling the case caught this mistake the night before defense counsel attempted to use it when he listened to a tape recording of that proceeding but did not bring it to counsel's attention until it became apparent to him that defense counsel intended to use this incorrectly transcribed testimony in exactly this way. After alluding to Supreme Court Rules 412 and 415 (73 Ill. 2d Rules 412, 415), the court in *Burgin* concluded that defendant's right to confront the witnesses against him had not been violated, that he had not been prejudiced by the State's failure to alert him to this error in the transcript and that his lawyer had effectively cross-examined the girl. In the instant case, counsel for defendant effectively impeached Jones' testimony by introducing the stipulated testimony of a firearms expert to the effect that the gun Jones testified Mims had used to shoot at him had not been fired that evening. In fact, the court ultimately found him not guilty of all the charges relating to Mims' alleged conduct outside the tavern that evening. There is therefore no basis here upon which to reverse Mims' conviction.

## III

■ According to Mims, the State should be required to preserve some record of the statements occurrence witnesses make to State's Attorneys who interview them shortly after the crimes they have witnessed have occurred. He relies upon the language and reasoning of the court in *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573. In *Taylor*, defendant's conviction for the unlawful delivery of heroin was overturned where the State could not provide defendant with any of the substance seized because the State had allegedly consumed all of it in tests that it had conducted to determine the nature of the substance. The court noted that these tests were not infallible and held that the State had a duty to preserve some part of the substance so that defendant could obtain an independent chemical analysis of the nature of the substance. The court concluded that defendant had been denied due process of law and the opportunity for meaningful cross-examination of the witnesses against him because the State had unnecessarily consumed all of the allegedly controlled substance defendant had had in his possession at the time of his arrest. Mims argues by analogy that the State should be required to preserve "some skeleton outline—a well chosen phrase or two summarizing what the witness said."

Supreme Court Rule 412 (73 Ill. 2d R. 412) concerns the State's responsibility to provide defense counsel with the information that he desires. Nothing in that Rule requires the State to reduce a witness' oral statements to writing and the courts have consistently held as we do that Rule 412 does not require the State to do so. *People v. Witherspoon* (1979), 69 Ill. App. 3d 391, 398, 388 N.E.2d 1; *People v. Abbott* (1977), 55 Ill. App. 3d 21, 24, 370 N.E.2d 286; and *People v. Caldwell* (1976), 39 Ill. App. 3d 1, 5, 349 N.E.2d 462.

## IV

■ Mims' last contention is that the extended-term sentences he received on both counts of armed robbery should be reduced to ordinary terms because he had already received an extended term sentence for murder, the most serious offense for which he was convicted, relying upon *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 428 N.E.2d 937, and, by implication, on *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520. Section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2) provides that an offender shall not be sentenced to a term of imprisonment in excess of the maximum sentence authorized by section 5—8—1 for the class

of the most serious offense of which the offender was convicted, unless the factors in aggravation set forth in section 5—5—3.2(b) are found to be present. The language in *Evans* upon which defendant relies in his proposed construction of section 5—8—2 is the statement by the supreme court: "We recognize that the present legislative scheme could lead to the anomalous result of insulating a defendant from receiving an extended sentence for an offense accompanied by wanton cruelty by virtue of his conviction of a more serious offense." (*People v. Evans* (1981), 87 Ill. 2d 77, 88.) In *Walsh*, we concluded, on the basis of the *Evans* language, that section 5—8—2(a) permitted an extended term sentence to be imposed upon a defendant only for the most serious offense for which he had been convicted. See also *People v. Freeman* (1982), 104 Ill. App. 3d 980, 985, 433 N.E.2d 974.

The State maintains that *Walsh* and *Freeman* are in direct conflict with the supreme court's decision in *People v. Williams* (No. 51870, filed April 16, 1982) (Williams I). Rehearing of that decision was allowed and the cause has now been reversed and remanded for a new trial based upon the supreme court's questioning, under the unique fact situation presented there, whether defendant had been deprived of his constitutional right to the assistance of counsel in light of a disciplinary case involving defendant's attorney which had thereafter come to the attention of the court. The subsequently issued *Williams* opinion, *People v. Williams* (1982), 93 Ill. 2d 309 (Williams II) left undisturbed the supreme court's analysis of the sentencing issue. We find that discussion instructive with respect to the proper resolution of the same issue arising in the instant case.

In *Williams I*, the supreme court noted that the sentences of defendant to 60 year extended terms for the aggravated kidnaping convictions were in error because the offenses, Class 1 felonies, may not result in extended-term sentences of more than 30 years. (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2, 1005—8—2.) As to defendant's claim there that the language of the extended term statute requires that both factors in aggravation be found before an extended term may be imposed, the supreme court first determined that the trial court finding of either factor was sufficient to permit the imposition of an extended term. The court went on to hold that the extended terms for rape were properly imposed and that the extended terms for aggravated kidnaping were also properly imposed but were required to be reduced to 30 years for the reasons earlier indicated. From the foregoing analysis, the clear implication is that extended-term sentences may be imposed in appropriate circumstances, *for different classes of offenses*, even in those situations where the offenses

are not the most serious for which an offender is convicted.

Here, the trial court found that defendant was convicted of the instant felonies after having been previously convicted in Illinois of the same or greater class felony, within 10 years (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(1)) and that the instant crimes were accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2).) Those findings are supported by the record. Accordingly, we depart from our holding in *People v. Walsh* and find that the circuit court's sentencing of defendant to extended terms for armed robbery was correct under section 5—8—2, notwithstanding his having received also an extended term sentence for murder.

For the reasons aforesaid, we find no basis for reversal of the defendant's conviction and sentences, and we affirm.

Affirmed.

STAMOS, P.J., and PERLIN, J., concur.