THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LEAMON JORDAN, Defendant-Appellant.

Third District   No. 82—23

Opinion filed April 14, 1983.

Robert Agostinelli and Pamela Peters, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

Defendant Leamon Jordan was charged by information with felony murder, kidnaping, and, on the basis of accountability, murder and fel-

ony murder. After a bench trial, the circuit court of Will County found defendant guilty of the latter three offenses, vacated its murder conviction, and sentenced him to concurrent 14- and 60-year terms of imprisonment.

The foundations of the State's case were defendant's extrajudicial confessions. The first of these confessions was made on March 5, 1981. Defendant met with Will County Investigator Raymond Crompton and Cook County Investigator Claude Kaysen and stated that he would like to relate a "story" or "fable." This was told by means of a role play in which he played himself, Crompton played "J.C.," and Kaysen played "J.S." Kaysen recalled the latter character as "Johnny S."

The role playing opened with J.S. or Johnny S. telling defendant, at a party, that someone had stolen an ounce of his cocaine. J.S. later telephoned defendant and said, "Come to Hooker's. We got to kill a bitch." At Hooker's Highway Lounge, defendant met with J.C. and J.S., and the latter said that Kathleen Jennings, the 17-year-old victim, had stolen his ounce, and that he would teach her a lesson. After the three had "snorted up three lines of 'dust,'" J.S. approached Jennings at the bar and asked her to come outside and smoke some marijuana. Once outside, he pushed her into the rear of defendant's brown Buick, which was parked next to his brown Cadillac. Defendant drove with J.C. in the front and Jennings and J.S. in the rear.

As they drove, Jennings denied taking the cocaine and told J.S. that she loved him. J.S. then told defendant to drive to "Joey's house." Upon the group's arrival, Robert Meryfield approached the car and greeted defendant and J.C. When J.S. then entered "Joey's trailer," Jennings attempted to escape, and defendant slapped her and told her to remain in the car. Upon learning of the attempted escape after he returned, J.S. hit Jennings in the face with a beer bottle and asked, "Who's going to kill the bitch? Who is going to kill her?" He then turned to the victim, put his hands on her throat, began to choke her, and asked, "Who's going to kill this bitch? Who's going to take care of her?" When J.S. let go, Jennings remained lying on the seat. All defendant heard from the victim was a "gargling sound."

J.S. told defendant to drive down the street, then down a gravel road to what defendant termed a "barn looking house." J.S. got out of the car, pulled Jennings out by the hair, threw her to the ground, and began kicking her. At no time did she move, scream, flinch, or cry out. J.S. threw up his arms and again asked, "Who's going to kill her?" J.C. then removed defendant's buck knife from the glove compartment and stabbed the victim in the stomach. When J.S. asked what they should do with her, J.C. suggested they "cut her up and throw her all over the

place."

The second confession was made on March 23, 1981. Defendant essentially repeated the events of the role play while identifying J.C. as John Cartalino, J.S. as John Siciliano, and Joey's house or trailer as the Joseph Holtrup residence. He also continued his narrative.

After Cartalino had stabbed the victim, he picked her up and walked to the rear of a residence. Defendant and Siciliano entered the front of the residence, walked down a long hallway, and saw Jennings propped up against a wall, half in the hallway and half in a room. After discussions of what to do with the body, defendant drove Siciliano to a service station at the intersection of Illinois routes 83 and 171, where the latter telephoned his father. Sam Siciliano met the group at the Holtrup residence, berated his son, and struck him in the head and body. He then instructed defendant and his son to wait in his car. When he joined them, he said, "Johnny is going to take care of everything."

Sam Siciliano then drove defendant and his son to a cocktail lounge and then to his residence. Defendant was instructed to exchange his bloodied trousers for a new pair. Eddie Migrant joined the group and drove defendant and Sam Siciliano to defendant's Bridgeview apartment, where a neighbor greeted Siciliano. Siciliano purchased defendant's car and told him to deliver it, with the title and keys, to a red-headed man named Art at the Cal Sag Junk Yard. Before doing so, defendant removed his knife from the seat. Facts beyond the two confessions will be introduced in conjunction with the issues to which they are germane.

The first of seven issues presented for our review is whether the admission of dental testimony concerning the cause of death denied defendant his right to confront and rebut the evidence against him in that the State's alleged failure to either adequately photograph the victim's jaw or prevent its cremation foreclosed any possibility of an independent examination of this evidence. Concerning the alleged failure to adequately photograph the jaw, defendant contends the nine photographs admitted into evidence did not accurately portray the color of the victim's teeth. Concerning the jaw itself, defendant contends this evidence should have been preserved for his experts to examine.

Four forensic odontologists testified regarding the photographs and other matters to be later considered. Forensic odontology is a branch of dentistry dealing with dental evidence, usually involving an examination of dental remains for identification, injuries to the jaw or teeth, or bite marks for comparison with those of a suspect. (Thornton, *Uses and Abuses of Forensic Science*, 69 A.B.A.J. 288 (1983).) Drs. Lester Luntz and George Morgan testified on behalf of the State.

Luntz thought that three of the photographs showed pink teeth and that the others were over or underexposed; and that a color patch was not necessary to accurately determine color from a photograph. Morgan, who had examined the jaw before the photographs were taken, thought the teeth were pinker than portrayed. He did not think the undermatting in the photographs that showed pink teeth appeared pink, and he selected three photographs he believed most accurately reflected the color he had observed. Drs. Donald Ore and Edward Pavlik testified on behalf of defendant. Ore found the color variation from photograph to photograph "remarkable" and discussed possible reasons for this. He thought that two photographs, also selected by Morgan, showed magenta or pinkish teeth but also thought the paper underneath those photographs appeared pink. Ore also found the *Chicago Tribune* on which the jaw was placed in another photograph appeared pink. He concluded that it was possible that none of the photographs accurately depicted the color and that, in any event, he could not make an accurate determination of color because the photographs lacked a balance or color chart. Pavlik thought that only the photograph with the *Tribune*, which he also thought appeared pink, showed pinkish teeth. He agreed with Ore that where an accurate determination of color is a concern, a color chart is routinely included in a photograph as a small patch inserted by the developer.

The admission of probative photographic evidence rests within the discretion of the trial court (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238), and a new trial is not required unless a defendant has been prejudiced (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203). While it is true that colored photographs may be excluded where they would mislead a jury because of the fact that colors are incorrectly portrayed (see 29 Am. Jr. 2d *Evidence* sec. 798 (1967)), we do not find the court abused its discretion in deciding otherwise. The judge not only saw the three photographs which Morgan said most accurately portrayed the color of the teeth, but also the entire set, which three experts agreed varied from pink to white.

Defendant's second contention regarding this first issue is that the jaw should have been preserved for his experts to examine. He claims the failure to do so violated his right to due process of law. For there to have been a violation of the right to due process, it must be shown that the evidence was suppressed after a request for it by a defendant, that the evidence was favorable to the defendant, and that it was material. (*People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40.) While not dispositive of this constitutional argument in this setting, we initially note that the jaw was not suppressed. The victim dis-

appeared in December 1979. In March 1980, her head was found in a doghouse. After it was autopsied, examined, and photographed, her father requested her remains and they were cremated. At this time defendant was not even a suspect in this case, and his arrest came approximately a year later. The coroner's action in releasing the remains under these circumstances was humanly decent and in harmony with the public policy of this State (see Ill. Rev. Stat. 1979, ch. 31, par. 10.7). These qualities do not, however, resolve the constitutional question. Assuming, *arguendo*, the jaw's materiality, it remains necessary to establish the evidence was favorable to defendant. Defendant contends retention of the jaw would have given his experts the opportunity to observe it and perform certain tests. While this would have been unquestionably desirable, the record is devoid of any indication that such would have resulted in evidence favorable to defendant. This being the case, we find no constitutional violation in the State's failure to retain the jaw.

The second issue is whether the trial court erred in holding that odontological testimony allegedly purporting to establish the cause of death had corroborated defendant's extrajudicial confessions. Defendant contends the testimony was inadmissible as odontologists cannot competently analyze medical evidence or draw medical conclusions or, in the alternative, that the testimony should be given no weight as the expert's conclusions were not supported by the evidence.

■ Concerning the alleged inadmissibility, defendant argues that the State's forensic odonologists were incompetent to testify that the cause of the victim's pink teeth was strangulation as they were incapable of analyzing medical evidence which was physiological in nature. Defendant based this argument on *People v. Gilliam* (1974), 16 Ill. App. 3d 659, 306 N.E.2d 352, which noted in *dictum* that only a qualified psychiatrist, not a psychologist, could give an opinion as to the sanity of a defendant. What defendant overlooks is that in that case the defense represented that the psychologist would testify that Gilliam had an I.Q. of 65, difficulty in understanding the motives of others, and difficulty in perceiving the consequences of behavior. As this did not form a basis for an opinion germane to criminal responsibility, the testimony was excluded on grounds of relevancy. In the case at bar, no relevancy argument is raised. Moreover, determining that an odonologist cannot testify as to teeth because a psychologist cannot testify as to sanity is not dictated by logical analysis. While the evidence was indeed physiological in nature, would such a nature prevent a dentist from testifying as to an abscess? We do not find, under *Gilliam*, that the court erred in admitting the testimony in question. Defendant addi-

tionally argues that the "pink teeth theory" did not have general acceptance in the dental community. We note that in this litigious environment, no expert disagreed with it, in theory. *Cf. People v. Burns* (1981), 97 Ill. App. 3d 858, 423 N.E.2d 980 ("red eye theory").

■ Concerning defendant's alternative contention that the testimony was not supported by the evidence, defendant argues that all possible causes of pink teeth, other than strangulation, were not eliminated. Eleven such causes were considered. Defendant concedes three, carbon monoxide, cyanide, and a direct blow to the head, were ruled out. The parties stipulated that Dr. John Spikes, who performed toxicological tests on samples of the victim's brain tissue, found no presence or trace of barbituates, stimulants, or tranquilizers; three additional causes. Climatological data eliminated rapid heat decomposition and rapid freezing. Drowning followed by several days of immersion was ruled out as the victim's skull showed no signs of excessive hydration. The experts disagreed as to extrinsic staining by tetracycline. Morgan and Luntz stated the stain would be brown, golden, grey or yellow. Ore and Pavlik disagreed and added other chemicals which would cause extrinsic staining; however, there was no evidence that tetracycline or these other chemicals had been ingested. Internal absorption through cellular destruction was considered a cause in live persons, but there was no testimony that it could be so after death. Given this evidence, we find the expert testimony in question to be supported by ample evidence.

The third issue presented for our review is whether defendant's convictions should be reversed as the evidence at trial allegedly substantially contradicted his extrajudicial confessions. Defendant argues that the contradictions arise as the confessions were fabrications. He supports this position with reference to the evidence *aliunde* the confession, the fact that they were made after he learned of a $50,000 reward from the Jennings, and the fact that he had successfully sold fabricated information to the Federal Bureau of Investigation in the past.

We initially note that we are dealing with not one, but two confessions. Given over two weeks apart, the statements are entirely consistent with one another. Nonetheless, some contradictions with the evidence exist. John Garvey did not see defendant in the company of Siciliano and the victim at Hooker's, but did see her enter Siciliano's Cadillac without any sign of force. The State offered no evidence to refute this. Meryfield did not recall seeing defendant in December 1979, but did recall that Holtrup told him Siciliano had knocked on the latter's door around 3 a.m. in early December. Holtrup acknowledged

this, but did not remember seeing defendant; however, Siciliano had entered the residence alone. Charles and Pamela Sullivan testified that an individual matching the victim's photograph was attending a loud party next door before she decided to disturb them at 3:30 or 4 a.m. Holtrup did not recall the party, but Pamela Sullivan was impeached by her prior inconsistent statement to Crompton that she had seen the victim between 9 and 11 p.m. on December 8. While not dealing with the crimes at bar, defendant also introduced evidence contradicting some details of what occurred after leaving the scene with Sam Siciliano.

It is axiomatic that in order for a conviction based on a confession to be sustained, the confession must be corroborated; and this requirement is satisfied by proof of the *corpus delicti*. (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.) As the *Willingham* court explained:

> "Although various criteria have been set forth for what is necessary to establish the *corpus delicti*, we believe the most precise explanation was given in *People v. Perfecto* (1962), 26 Ill. 2d 228, 229 where this court stated:
>
> ' "The true rule is that if there is evidence of corroborating circumstances which tend to prove the *corpus delicti and* correspond with the circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the *corpus delicti* is sufficiently proved in a given case. (*People v. Borrelli*, 392 Ill. 481.) The same evidence may be used to prove both the existence of the crime and the guilt of the defendant, the test being whether the whole evidence proves the facts that a crime was committed and that the accused committed it. *People v. Brown*, 279 Ill. 262." *People v. Gavurnik*, 2 Ill. 2d 190, at 194.' (Emphasis added.)
>
> Thus, in establishing the *corpus delicti*, there must be some evidence, apart from the confession, demonstrating that a crime occurred. Once the required showing has been made, the circumstances along with the confession may be considered in determining whether the *corpus delicti* is sufficiently proved (as well as the guilt of the defendant). Accord, McCormick, Evidence § 158, at 346-47 (2d ed. 1972)." (*People v. Willingham* (1982), 89 Ill. 2d 352, 359-60, 432 N.E.2d 861, 864-65.)

Thus, in addition to the contradictions, we must consider the corroborating circumstances which tend to prove the *corpus delicti*.

■ Two such circumstances relate to the physical evidence which

was considered. We have previously discussed the fact the victim's pink teeth were consistent with her having been strangled. Forensic scientist Pat Hamby performed tests on the victim's blouse and testified that there were nine areas that exhibited "cut-like damage" as opposed to tears. The cutting edge of the instrument used was single with a broad back, consistent with the blade of defendant's knife. Other testimony was also corroboratory. Meryfield's and Holtrup's testimony establishes that Siciliano went to Holtrup's residence around 3 a.m. in early December 1979. Sharon Beck testified that at approximately 1:30 a.m. on December 9, she had dropped the victim off at Hooker's. Garvey saw her enter Siciliano's car that morning. Crompton testified that there is a service station as indicated in the confessions, and that it is nearby Holtrup's residence. The "barn-like house" was identified as the Diemer residence, located next to that of Holtrup. The latter's stipulation indicated he constructed both, but defendant had never been to his home. A comparison of floor plans showed that there is a hallway in Holtrup's but none in Diemer's. This corroborated defendant's detailed description of the interior of the home where the victim's body had been placed, especially the long hallway. Parts of the victim's dismembered body were found on the Holtrup property as well. Finally, no one was aware of the victim's stab wounds until after defendant's confessions. Given the totality of this evidence, and the explanations or refutation of most of the material contradictions, we find the confessions sufficiently corroborated and reversal unwarranted.

■■ The fourth issue is whether defendant's convictions for kidnaping and felony murder (accountability) must be reversed as allegedly inconsistent with the trial court's acquittal of defendant of felony murder. After an excellent discussion of inconsistent verdicts in criminal bench trials, a standard was recently established:

"Legal inconsistency in the finding should not, on a *per se* basis, require reversal of the conviction. Inconsistency is only one element to consider in determining the existence of proof beyond a reasonable doubt. When, as in the present case, there is a rational explanation for the inconsistent finding other than confusion, the inconsistency will not contribute to a determination that defendant was not proved guilty beyond a reasonable doubt. Trial judges can assist appellate review by explaining their findings on the record. *Cf. Harris v. Rivera* (1981), ____ U.S. ____, ____, 70 L. Ed. 2d 530, 534, 102 S. Ct. 460, 463." (*People v. O'Malley* (1982), 108 Ill. App. 3d 823, 833, 439 N.E.2d 998, 1004, *appeal denied* (1982), 92 Ill. 2d ____.)

Regarding the count of which defendant was acquitted, the court noted that he was charged with felony murder as a principal and explained

that it "felt that the charges that most accurately reflected what had transpired were those contained in Counts 3 and 4," the accountability counts. Rather than a display of confusion, this appears a display of fairness and lenity. While we specifically decline to address the issue, it appears that defendant might have been convicted based on his kidnaping conviction. Defendant argues that his sentence belies the existence of leniency; however, the court's sentences for crimes that "most accurately reflected what had transpired" is not inconsistent with his acquittal of a crime which did not. Given this rational explanation, the convictions need not be reversed. Defendant should not be allowed to take advantage on appeal of the trial court's exercise of lenity (see *People v. O'Malley* (1982), 108 Ill. App. 3d 823, 832-33, 439 N.E.2d 998, 1004-05) and fairness.

The fifth issue presented for our review is whether defendant's kidnaping conviction must be reversed as his confessions were allegedly not corroborated by sufficient independent proof of the *corpus delicti*. Defendant contends the State failed to produce any independent evidence of defendant's kidnaping the victim. We have previously discussed the general principles governing our determination in our consideration of the third issue in this cause.

In the cause at bar, defendant confessed that the victim was induced to leave Hooker's by Siciliano suggesting they go outside to smoke some marijuana. Beck's testimony establishes Jennings presence at the lounge, as did that of two other witnesses. Garvey saw her leave the establishment with Siciliano and enter what he believed was the latter's brown Cadillac; however, given the hour and consumption of 10 drinks, a brown Cadillac and Buick could be confused. Defendant's confessions then indicated the men took the victim to the vicinity of a "barn-looking house," outside of which she was murdered. The house was photographically identified as the Diemer residence. On February 26, 1980, the Diemers located a human skull and some long bones approximately 60 feet from their home. The victim's clothing and effects were discovered approximately 365 feet southeast of the residence and 310 feet south of the Holtrup residence.

■ Under the authority of *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861, we hold the confessions to kidnaping were sufficiently corroborated.

■ The sixth issue is whether defendant's 60-year sentence for felony murder (accountability) was excessive as his allegedly passive participation in the crime mitigated the seriousness of his offense and as, given defendant's youth and nonviolent history, the term does not serve the objective of restoring him to useful citizenship. The trial court found no factors in mitigation. In aggravation, it considered two

convictions for battery and theft and one for burglary. The court found the offense was accompanied by extremely brutal or heinous behavior indicative of wanton cruelty, and that not one shred of mercy was shown to the victim. It noted the crime was an "absolutely gross example of one person's inhumanity to another person," and determined that the sentence must deter others from the same behavior. The trial court is normally the proper forum in which a suitable sentence is to be determined, and the court's decisions in regard to sentencing are entitled to great deference and weight. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Absent an abuse of discretion, a sentence may not be altered upon review. (*People v. Perruquet.*) Given the totality of factors considered by the court, we fail to find such an abuse due to defendant's age and the fact others in society may be more violent.

The seventh and final issue presented for our review is whether the trial court erred in imposing an extended-term sentence for kidnaping where that offense was not the most serious of which he was convicted. The supreme court addressed this issue in *People v. Evans* (1981), 87 Ill. 2d 77, 87-88, 429 N.E.2d 520, 524-25:

> "Section 5—8—2(a) of the Unified Code of Corrections provides:
>
> > 'A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 *for the class of the most serious offense of which the offender was convicted* unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present.' (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a).) (Emphasis added.)
>
> When section 5—8—2(a) is read in conjunction with section 5—5—3.2, it is clear from the plain language of the statutes that the most serious offense of which the offender is convicted must be accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. * * *
>
> We recognize that the present legislative scheme could lead to the anomalous result of insulating a defendant from receiving an extended sentence for an offense accompanied by wanton cruelty by virtue of his conviction of a more serious offense."

Subsequent to *Evans*, the initial discussions of the issue at bar interpreted that decision in defendant's favor. (See *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 1148, 428 N.E.2d 937, 940; *People v. Freeman* (1982), 104 Ill. App. 3d 980, 985, 433 N.E.2d 974, 978; *People v. Winston* (1982), 106 Ill. App. 3d 673, 688-89, 435 N.E.2d 1327, 1339, *appeal denied* (1982), 91 Ill. 2d 580.) While the denial of leave to appeal in

*Winston* appeared to sanction this interpretation, the court in *People v. Mims* (1982), 111 Ill. App. 3d 814, 444 N.E.2d 684, departed from its earlier holding in *Walsh* on the basis of *People v. Williams* (1982), 93 Ill. 2d 309. As the *Mims* court noted:

> "In *Williams I*, the supreme court noted that the sentences of defendant to 60 year extended terms for the aggravated kidnaping convictions were in error because the offenses, Class I felonies, may not result in extended-term sentences of more than 30 years. (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2, 1005—8—2.) As to defendant's claim there that the language of the extended term statute requires that both factors in aggravation be found before an extended term may be imposed, the supreme court first determined that the trial court finding of either factor was sufficient to permit the imposition of an extended term. The court went on to hold that the extended terms for rape were properly imposed and that the extended terms for aggravated kidnaping were also properly imposed but were required to be reduced to 30 years for the reasons earlier indicated. From the foregoing analysis, the clear implication is that extended-term sentences may be imposed in appropriate circumstances, *for different classes of offenses*, even in those situations where the offenses are not the most serious for which an offender is convicted." *People v. Mims* (1982), 111 Ill. App. 3d 814, 821-22.

We agree with the *Mims* court's conclusion that section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)) does not limit the imposition of an extended term sentence to the most serious class of offense of which an accused is convicted. In our view, the provision rather limits the maximum sentence a defendant may receive in a multiple conviction situation to that of the class of the most serious offense of which he has been convicted *unless* a section 5—5—3.2(b) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)) factor in aggravation is present. As such a factor is here present, the court did not err in imposing the extended-term sentence for kidnaping.

Accordingly, the judgment of the circuit court of Will County is affirmed.

Affirmed.

ALLOY and SCOTT, JJ., concur.