THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GRAYLIN WASHINGTON *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 82—1133, 82—1134, 82—1306 cons.

Opinion filed September 4, 1984.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, and I. Bruce Wexler, both of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jeanette Sublett, and Frank G. Zelezinski, Assistant State's Attorneys, of counsel), for the people.

JUSTICE PERLIN delivered the opinion of the court:

Defendants were tried before a single jury on charges of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1), armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2), attempted murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—4), and aggravated battery (Ill. Rev. Stat. 1981, ch. 38, par. 12—4). The jury was also given the instructions for voluntary manslaughter. Defendants were convicted on all charges, including voluntary manslaughter. Davis was sentenced to concurrent extended terms of 80 years for murder, 60 years for attempted murder, 60 years for armed robbery and 10 years for aggravated battery. Washington was sentenced to consecutive terms of 25 years for murder, 25 years for armed robbery and 5 years for aggravated battery. Spencer was sentenced to concurrent extended terms of 50 years for murder, 40 years for attempted murder and armed robbery and 10 years for aggravated battery.

Defendants raise the following issues in this appeal: (1) whether the evidence was sufficient to sustain Spencer's convictions on the basis of accountability; (2) whether the trial court erred in "merging" defendants' convictions for voluntary manslaughter into their convictions for murder; (3) whether the evidence was sufficient to sustain the convictions for armed robbery; (4) whether the defendants were properly convicted of attempted murder as to one victim and voluntary manslaughter as to the other victim; (5) whether the jury was properly instructed with regard to defendants' claim of self-defense; (6) whether the trial court erred in admitting evidence of defendants' prior criminal activity; (7) whether certain comments by the prosecutor deprived defendants of a fair trial; (8) whether the trial court erred in admitting certain weapons into evidence; (9) whether

the statement of a victim to police was properly admitted into evidence as a spontaneous declaration; (10) whether Davis was denied the effective assistance of counsel; (11) whether the trial court considered improper evidence during defendants' sentencing hearing; (12) whether the trial court erred in imposing multiple extended-term sentences on Davis and Spencer; (13) whether defendants were convicted of multiple crimes based on the same act.

Prior to trial, defendants' motions to quash their arrests and to suppress evidence were denied.

At trial, Linda Dates testified: On May 6, 1981, at approximately 1:30 a.m. she was in her second floor apartment at 1440 South Kedzie in Chicago with her roommates, Charlie Cox and Lex Leaks, when the doorbell rang. At that time Dates was in the dining room watching television, Cox was in the same room sleeping on the sofa, and Leaks was in a rear bedroom. Dates looked out the window and saw three men standing near the front door of the apartment. She identified the three men as the defendants.[1] She had seen Davis and Spencer on prior occasions, but not Washington.

Leaks dropped a key down to the men at the door. The men came up to the apartment. They did not speak upon entering the apartment. Dates returned to the dining room and awakened Cox. Cox then went to the rear of the apartment where the visitors were. Dates went to a bedroom in the front part of the apartment. On her way, she saw Spencer and Washington, but did not notice Davis.

As Dates closed the door to the front bedroom, she heard two shots. She testified that she considered jumping out the window, but instead hid in the bedroom closet, covering herself with clothing. She then heard another shot followed by the sound of approaching footsteps. She heard the door to the bedroom being kicked open and then Spencer's voice say, "Come from under that bed, girl, before I shoot." She remained in the closet until the police arrived 10 minutes later. She testified that when the police arrived she was hysterical and could not recall what she had told the police. She denied telling the police that she had heard the shots "5 to 10" minutes after she entered the bedroom.

Charlie Cox testified: When Dates woke him and told him some

---

[1]During the course of the trial, the defendants were referred to by various nicknames. Davis was referred to as "Edward Black" and "Boonie Black." Spencer was referred to as "Moto" and "Johnny Gatt"; Washington was referred to as "Smokey," "Curtis Taylor" and "Lee." In this opinion we will refer to defendants by the names contained in the caption of this case.

men were in the apartment, he went to the back bedroom. He saw his roommate Leaks with Washington and Spencer. When Cox entered the bedroom, Spencer grabbed him from behind, and the two of them struggled. Spencer's two hands were encircled around Cox's stomach. As they tussled, Cox saw Davis point a .9-millimeter pistol at him. Washington then pulled an automatic pistol from his waist and also pointed it at Cox. There was no conversation. Davis and Washington began to shoot. Two or three shots were fired; Cox was hit in the elbow and stomach (near Spencer's encircling hands) and fell to the ground.

"Seconds" after falling, Cox felt the body of Leaks next to his. He heard footsteps moving toward the front of the house and then returning. Cox "felt" someone take from him the jewelry he was wearing, including a ring and some chains, and about $100. When he heard the men going down the apartment stairs, Cox stood up and telephoned someone from his family. He did not recall whether he called the police. Cox then briefly went upstairs to the third floor apartment. When the police arrived, Cox identified the three defendants as his assailants. While in the hospital a few days later, he also identified their pictures.

Dr. George London testified: He is a surgeon at Mt. Sinai Hospital and he operated on Charlie Cox. Cox had been shot twice; one bullet passed through his body on the left side of the abdomen, and the other lodged near his spine. Dr. London did not remove the latter bullet because of the possible dangers in such an operation.

Edward R. Donaghue, Jr., testified: He is a physician and forensic pathologist employed by the Cook County Medical Examiners Office. He performed the autopsy on Lex Leaks. Leaks was killed by a single bullet which entered his chest on the left side of the body, perforating the "main artery of the aorta" and the kidney and liver. The bullet had traveled "downward."

Chicago police officer Daniel McGovern testified: On the date in question he and his partner responded to the call of a man shot at 1440 South Kedzie. Upon arriving at the apartment two or three minutes after receiving the call, they found the body of Lex Leaks and heard Dates repeatedly yell to Leaks' brother, Kermit, who was then present, that Davis had shot Leaks. Cox told the officers that Davis and two other persons had shot him.

Following a discussion with Kermit Leaks, McGovern, his partner, Officer Trepac, and Kermit Leaks proceeded to an apartment at 3317 West Madison in Chicago. They requested a back-up unit, and when

plainclothes officers Wolverton and Kurtovich arrived, the officers entered the apartment building. They saw Washington on a stairway landing aiming a .45 automatic at them. Washington turned and ran. The officers followed him and next saw him standing in a hallway with Spencer. Spencer was holding a .30-caliber sawed-off rifle and had a .9-millimeter pistol in his pocket. Spencer had been shot in both hands. Spencer and Washington surrendered and were arrested.

Chicago police officer Donald Wolverton testified: After Spencer and Washington were arrested, he went upstairs to the third floor staircase landing in the building. He there saw Davis, who dropped objects he was holding in his hand and ran into an apartment and closed the door behind him. Davis had dropped a white plastic bag which contained a .30-caliber carbine rifle, a loaded .9-millimeter pistol and a .38 revolver. Wolverton waited for assistance, and then entered the apartment into which Davis had fled. The apartment was empty. There was a stairway leading down to the apartment below. When Wolverton went down the stairs to the lower apartment, he found that Davis had been arrested there by other officers.

Police officer Larry Puzas testified: When he arrived at the apartment on West Madison, he saw Davis emerge from a second floor apartment with a shotgun. Puzas followed Davis back into the apartment and, at the officer's order, Davis dropped the shotgun and surrendered.

Officer Wolverton testified that after the three defendants were in custody he recovered from Washington a key on a chain which unlocked the front door to the apartment where the shootings had occurred. At the murder scene, a spent bullet and two cartridge casings were recovered from the rear bedroom. The bullet had been fired from the .9-millimeter pistol which was found in the plastic bag dropped by Davis. Human blood found at the murder scene was of an undetermined type. Blood found on the jacket worn by Washington was type B. Leaks' blood was type O.

Several pieces of jewelry were recovered from the defendants, including a ring and two chains. $114 in cash was found in Washington's possession. Dates and Cox identified the ring and one of the chains as belonging to Leaks; the other chain was Cox'.

Richard Chenow, a Chicago police officer employed as a firearms examiner, testified that the .9-millimeter bullet recovered from the crime scene had been fired from one of the two .9-millimeter pistols recovered from defendants. He stated that it was "absolutely not" possible that the bullet had been fired from the second .9-millimeter pistol.

After entering into stipulations that Davis was 44 years old, Spencer was 35 and Washington was 25, the State rested.

Washington was the only defendant who testified. He stated that he had been convicted of possession of heroin in 1975, and twice was convicted in 1977 of unlawful use of weapons. On the night of the shooting, he and Spencer had gone to Leaks' apartment to purchase cocaine with the $100 Washington carried. Washington had purchased cocaine in that apartment from Leaks on several previous occasions. Davis was not with them.

Washington was then carrying a .9-millimeter pistol. After Washington rang the apartment bell, Leaks dropped to him the key to the front door. Spencer, Washington and Leaks then went to the rear bedroom of the apartment. While Leaks weighed the cocaine, Washington complained that the scale was not "sitting right." After a brief argument about the weight of the cocaine, Cox entered the room and, according to Washington, asked Washington why he was arguing with Leaks. Cox then commenced arguing with Spencer about some money Spencer allegedly owed him.

Washington testified that Cox then pulled a pistol and, from a distance of five to six feet, shot Spencer once in each of his hands. When Cox turned toward Washington, Washington pulled out his own pistol and shot Cox twice. As Cox fell, Washington noticed Leaks turn away from the dresser and point a gun at him, whereupon Washington shot Leaks once. Washington testified that he fired his gun because he was afraid he would be shot; he had been held up and shot in the past.

Washington stated that the jewelry taken from him by the police was his own. So, also, the money recovered was his; he had brought it to the apartment to buy cocaine. He denied taking anything from Cox or Leaks. There was blood on Washington's jacket from Spencer's wounds. It was Spencer who suggested that they go to Davis' apartment on West Madison after the shootings. Washington took with him Leaks' and Cox's guns, a .38 and .45. At Davis' apartment Washington put all of the guns in a white plastic bag, except for the .45, which he kept. Washington admitted that when the police approached him he ran, but he denied ever pointing a gun at them. The parties then stipulated that Dates had told a police investigator that some 5 to 10 minutes elapsed between the time that the defendants entered the apartment to the time the shooting started and that she knew Davis from previous encounters in the neighborhood, but not from the crime scene.

Michael Williams testified for defendants: He was a pallbearer at Leaks' funeral. He had gone to Leaks' and Cox's apartment "almost

on a daily basis" for the past two years to buy cocaine and marijuana. He stated that Cox's reputation in the neighborhood for being truthful and a peaceful and law-abiding citizen was not good. Cox had told Williams that Davis was not at the apartment on the night of the shooting; that Cox had shot Spencer and Washington had then shot Leaks and Cox. Williams stated that he currently had pending against him narcotics charges for possession of "cocaine and pills," and that his attorney for those charges was Spencer's attorney in the present case. He alleged that no one had told him what to say in court.

Barbara Olmond testified for defendants: She was Michael Williams' girl friend, and Spencer's attorney in the instant case also represented her in a pending drug charge. She was formerly Cox's girl friend and had lived with him at the apartment where the shootings occurred. Cox had sold marijuana and cocaine in the apartment when she lived there. Cox used cocaine daily and often carried a gun. She had once had him arrested for assaulting her. Cox's reputation in the neighborhood for being truthful and a peaceful and law-abiding citizen was bad. She also testified that she had seen Ms. Dates use cocaine.

The parties stipulated that at the time of trial Cox had pending against him charges for unlawful use of weapons and possession of a controlled substance.

In rebuttal, the parties stipulated that Washington had initially told police that he did not know how the blood had gotten on his jacket, and that he "did not know" the victims.

After closing argument, the jury found defendants guilty of murder, voluntary manslaughter, armed robbery, attempted murder and aggravated battery. The court "merged" the voluntary manslaughter convictions into the murder convictions. After a sentencing hearing, the court imposed the aforesaid sentences.

I

Defendant Spencer argues that his convictions, based on accountability, were not proved beyond a reasonable doubt in that all of the elements necessary to show accountability were not established. He correctly states that accountability requires proof of three elements: (1) that he solicited, aided, abetted, agreed or attempted to aid another in the planning or commission of the offense; (2) that his participation took place before or during the offense; and (3) his participation was accompanied by the concurrent, specific intent to promote or facilitate commission of the offense. (Ill. Rev. Stat. 1981, ch. 38, par. 5—2; *People v. Tillman* (1971), 130 Ill. App. 2d 743, 265 N.E.2d 904.) Spencer contends that the first and third elements were not proved

here.

■ With regard to the first element, defendant contends that because Washington testified that he alone shot the victims, and that the shooting was done in self-defense, Spencer could not have aided in the planning or commission of the crimes. We disagree. First, the jury was not required to accept Washington's version of the story but would consider all of the surrounding circumstances as well as the probability, or improbability, of his account. (*People v. Olmos* (1978), 67 Ill. App. 3d 281, 384 N.E.2d 853.) Second, there was sufficient evidence, if believed, to establish that Spencer was not a mere bystander. Cox testified that Spencer held him while Davis and Washington shot him. Ms. Dates testified that Spencer threatened to shoot her. Spencer did not try to stop the crimes or call the police. The jury could also consider, in this regard, the evidence that Spencer fled with the other defendants and then ran from, and pointed a gun at, the police. (*People v. Bunting* (1982), 104 Ill. App. 3d 291, 432 N.E.2d 950.) The first element of accountability was thus proved.

With regard to the third element of accountability, proof of defendant's intent to promote or facilitate commission of the offense, we again find sufficient evidence in the record to support the jury's determination. The State's burden is met if the evidence demonstrates that the accused "shared the criminal intent of the principal or that there was a community of unlawful purpose." (*People v. Ramirez* (1968), 93 Ill. App. 2d 404, 411, 236 N.E.2d 284.) Community of purpose or common design may be shown by the spontaneous and joint participation of a group in the commission of an offense. (*People v. Hill* (1977), 53 Ill. App. 3d 280, 368 N.E.2d 714.)

> "The requisite mental state for a crime may be proved by the acts and circumstances surrounding the defendant's conduct. *** The fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. [Citation.] If the proof shows that the accused was present at the scene of the crime and did not disapprove or oppose it, the trier of fact may competently consider that conduct in connection with other circumstances and thereby reach the conclusion that the accused assented to the commission of the criminal act, lent to it his countenance and approval and was thereby aiding and abetting the crime. [Citations.]" (*People v. Porter* (1975), 28 Ill. App. 3d 411, 414, 328 N.E.2d 618.)

A conviction for manslaughter based on accountability will be upheld

where the evidence shows that more than one person was involved in the attack on the victim, and the accused participates therein. (*People v. Hill* (1977), 53 Ill. App. 3d 280, 368 N.E.2d 714.) The evidence presented here was sufficient to support the jury's determination that Spencer's participation in the crimes made him accountable for them.

## II

■ At defendants' request, the jury was given voluntary manslaughter instructions. Defendants were convicted of both murder and voluntary manslaughter. Each defendant alleges that the trial court erred when it "merged" the jury's convictions for manslaughter into the murder convictions. Defendants contend that since Washington testified that he shot the victims in self-defense, and the jury convicted defendants of voluntary manslaughter, thus the jury necessarily found that the shootings were accompanied by the unreasonable belief that they were justified by self-defense. Defendants contend that the murder verdicts do not in any way "negate" this finding as to their mental state, and that the voluntary manslaughter verdicts preclude convictions for murder because the latter requires the jury to find that defendants' mental state was an intent to kill or do great bodily harm.[2] This argument has merit.

In *People v. Kendricks* (1984), 121 Ill. App. 3d 442, 446, 459 N.E.2d 1137, this court held:

"In the instant case, the jury found defendant guilty of both murder and voluntary manslaughter. In finding defendant guilty of the latter charge, the jury necessarily ruled that the level of intent which motivated the killing was not malice aforethought, which is the state of mind required for murder. Thus, the jury impliedly acquitted defendant of murder and the trial court should have entered judgment on only the voluntary manslaughter verdict."

Other cases have reached the same conclusion. See *People v. Fox* (1983), 114 Ill. App. 3d 593, 449 N.E.2d 261; *People v. Stuller* (1979),

---

[2]As shown, *infra*, defendants rely heavily on the jury's voluntary manslaughter verdicts to bolster many of their arguments on appeal. They contend that this verdict compels this court to (1) find that the jury believed Washington's self-defense testimony and (2) to reach various conclusions favorable to defendants based thereon.

We believe it to be at least equally possible that the manslaughter verdict was a result of the jury's decision to convict defendants on each charge submitted to them. We believe this case demonstrates the importance of a trial court instructing a jury on all theories supported by the evidence (including, here, felony-murder) and instructing them also as to the distinction, indeed the contradiction, between murder and voluntary manslaughter.

71 Ill. App. 3d 118, 389 N.E.2d 593; *People v. Taylor* (1976), 36 Ill. App. 3d 898, 344 N.E.2d 742.

The State suggests that because defendants here were convicted of both murder and armed robbery, we should find that the jury convicted them of felony-murder. Because a felony-murder conviction precludes a determination that the participants were guilty of manslaughter (see *People v. Moore* (1983), 95 Ill. 2d 404, 447 N.E.2d 1327), the State concludes that only a murder verdict can here stand. We cannot accept the State's view. Because the jury was not given a verdict form for felony-murder, and because the evidence presented here allows for the possibility that a jury could find that the death of Leaks had not occurred while defendants were "committing or attempting to commit" (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3)) an armed robbery, we cannot make a *de novo* finding of felony murder. See *People v. Fox* (1983), 114 Ill. App. 3d 593, 449 N.E.2d 261.

We therefore hold that the trial court erred in vacating the voluntary manslaughter convictions and merging them into the murder convictions. The defendants' murder convictions must rather be vacated, and the convictions for voluntary manslaughter reinstated, and this cause remanded for resentencing.

### III

■ Defendants Washington and Spencer argue that there was insufficient evidence upon which to find them guilty of armed robbery. They state that since the voluntary manslaughter convictions show that the jury found the shootings were committed by Washington while he was acting under the unreasonable belief that self-defense was justified, any robbery occurring after the shootings was a subsequent unrelated act, and thus the property "was not taken with the requisite force for an armed robbery."

The armed robbery statute provides that the property must be taken "by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1981, ch. 38, par. 18—1.) It has been held that the force necessary to establish armed robbery is that which temporarily suspends the victim's power to exercise his will and causes him to part with his property. (*People v. Stewart* (1977), 54 Ill. App. 3d 76, 369 N.E.2d 131.) The force resulting in the armed robbery must either precede or be contemporaneous with the taking of the property. (*People v. Whitley* (1974), 18 Ill. App. 3d 995, 311 N.E.2d 282.) The evidence must show that the force employed "was the means used by the robber" to take the property. *People v. Braverman* (1930), 340 Ill.

525, 531, 173 N.E. 55.

Our supreme court has held that where parties are engaged in mutual combat and one is disabled, any subsequent robbery of him is in fact robbery even though the accused "may not have intended to rob his opponent from the outset," and the fact that the victim had been reduced to a state of physical nonresistance before the money was taken "does not relieve the crime of the quality of robbery." (*People v. Jordan* (1922), 303 Ill. 316, 319, 135 N.E. 729.) Similarly, in the present case, where defendants suggest no robbery was intended until after the victims were shot does not compel a determination that the shooting was "unrelated" to the robbery. Here the evidence showed that immediately after Cox was shot, he felt his property being removed. Under these facts, the jury could properly find the victims were robbed "by the use of force." See also *People v. Randolph* (1972), 4 Ill. App. 3d 277, 280 N.E.2d 774.

## IV

Washington and Spencer charge that in light of the fact that they were convicted of voluntary manslaughter as to Leaks, it was not legally proper to convict them of attempted murder as to Cox because they could not coincidentally have had both the "unreasonable belief in self defense" as to the shooting of Leaks, as well as the specific intent which is necessary for attempted murder as to Cox. Without citation to authority, defendants argue that the facts indicate that defendants' intent during the two shootings must necessarily have been the same.

■ We do not agree. While defendants are correct in asserting that the two offenses require different mental states, the evidence presented allowed the jury to conclude that defendants in fact had such different mental states with regard to the shootings of the two victims. Cox testified that he was held by one defendant and shot by the other two. Such evidence supports a determination that defendants acted with an intent to kill or to do great bodily harm or to act with the knowledge that their acts created a strong probability of death or great bodily harm to Cox, the mental states required for the crime of attempted murder. *People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345.

Defendants were also convicted of voluntary manslaughter as to Leaks, which verdict can likewise be supported by the record. However, the latter verdict in no way contradicts, or precludes, the guilty verdict for attempted murder, and we must therefore reject defendants' argument.

## V

■ Each defendant argues that his right to due process, and to a fair trial, were violated because the jury was not instructed that in order to convict them of both attempted murder and aggravated battery the State must prove beyond a reasonable doubt that defendants' use of force was not justified. They contend that Washington's testimony raised the issue of self-defense and thus the jury should have been given Illinois Pattern Jury Instruction (IPI), Criminal, No. 24—25.06A (2d ed. 1981) with regard to the State's burden. The record indicates that although the jury was instructed as to the State's burden of disproving self-defense with regard to the murder charge, no similar instruction was given as to the attempted murder and aggravated battery charges. Defendants neither objected to the instructions given nor tendered the instructions they now claim should have been given.

Among the instructions given to the jury were: IPI Criminal No. 2.03, setting forth the State's burden of proof; IPI Criminal No. 7.01 which defines murder as, *inter alia*, a killing occurring "without lawful justification"; IPI Criminal No. 24—25.06A, the issues instruction for the justifiable use of force, which provides that the State must prove, among other facts, that the defendant "was not justified in using the force which he used"; IPI Criminal No. 7.05, which defines the offense of voluntary manslaughter and states that at the time of the killing the defendant "believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable"; IPI Criminal No. 7.06, the voluntary manslaughter issues instruction, which provides, *inter alia*, that the State must prove that the defendant "believed that circumstances existed which would have justified killing Lex Leaks" and that such belief "was unreasonable." The jury was also given IPI Criminal No. 24—25.06, which defines the use of force in defense of a person, and No. 24—25.10, stating that a person is not justified in using force if he is committing a forcible felony.

The instruction here in issue, IPI Criminal No. 24—25.06A, is the instruction requiring the State to prove "that the defendant was not justified in using the force which he used." As noted above, this proposition was included in the murder and voluntary manslaughter instructions; the issue thus is whether error occurred when this proposition was not included in the issues instructions for the charges of aggravated battery and attempted murder. Because we hold that the aggravated battery convictions must be vacated, we limit our consideration to the question of whether error occurred when the jury was not instructed that in order to convict defendants of attempted mur-

der, the State had the burden of proving that defendants were not justified in using the force which was used.

The first question is whether waiver should preclude our consideration of this issue. In *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248, the supreme court ruled that failure to give a self-defense instruction would be reviewed pursuant to the plain error doctrine only where necessary to correct "grave error" or when the case was "factually close" and therefore "fundamental fairness" required that the jury be properly instructed. The *Huckstead* court found that because the jury instructions there given, coupled with the closing arguments of counsel, in fact apprised the jury of the State's burden with respect to self-defense, no grave error occurred. The *Huckstead* court also found that the evidence was "not closely balanced on the question of whether the shooting occurred as a result of self-defense" and concluded that under the circumstances of that case, the failure to give a self-defense instruction was not reviewable under the plain error doctrine.

In a later decision in *People v. Berry* (1983), 99 Ill. 2d 499, the supreme court applied the *Huckstead* rule with regard to the failure to instruct the jury on self-defense and the doctrine of plain error. In *Berry* the court found that "grave error" occurred because the jury was not apprised by the attorneys in closing arguments that the State had the burden of proving that self-defense was not justified, and further the court determined that the case was "factually close" because there was evidence to indicate that the victim of the shooting had been the initial aggressor. Thus, the *Berry* court found that the failure to give the jury self-defense instructions was in that instance plain error.

Turning to the instant case, our review of the record leads us to conclude that the failure to instruct the jury with regard to the State's burden in disproving self-defense as to the charge of attempted murder does not rise to plain error. Because the jury instructions given, and the arguments of counsel, did in fact advise the jury of the State's burden with regard to self-defense, we find that no grave error here occurred. The instruction setting forth the State's burden twice refers to the "offense of murder." We believe such instruction, when examined in light of the murder instruction and its provisions noting the State's burden to prove that the use of force "was not justified," together with the other instructions given, adequately informed the jury.

This determination is supported by the fact that both the State and defendants' counsel made clear to the jury that the defense pre-

sented was that of self-defense. In closing, Washington's attorney specifically linked the murder and attempted murder charges together and emphasized the State's burden in disproving self-defense as to those two charges. He stressed his opinion that the State had failed to meet that burden. So also in closing arguments, the State's Attorney examined defendants' self-defense testimony and compared it unfavorably to the physical and testimonial evidence. He contended that the self-defense "story" was "nonsense" and did not make sense "legally." Under the totality of these circumstances, we find that no grave error occurred when the jury was not instructed that in order to prove defendants guilty of attempted murder, the State must prove that defendants' use of force was not justified.

Nor do we believe that the evidence presented at trial shows this to be a "close case" with regard to the issue of whether the shootings occurred as a result of self-defense.

■ The only evidence supporting a theory of self-defense was Washington's own testimony, which was, in its most generous light, improbable. His story was substantially contradicted, both by his own prior inconsistent statements as well as other physical and testimonial evidence. Cox and Dates testified to a completely different chain of events than Washington. Washington's testimony that he shot Leaks as Leaks turned toward him was contradicted by Dr. Donaghue, who stated that Leaks' death was caused by a bullet traveling in a "downward" path. Washington's statement that Cox had shot Spencer in each hand with a .45-caliber pistol from a distance of four or five feet was not supported by any other evidence; no bullet holes were found in the apartment, nor were any .45-caliber bullets or shell casings recovered. Cox's testimony that Spencer was standing behind him, with both hands around Cox's stomach, at the time Cox was shot in the stomach is a clearly more plausible explanation for Spencer's hand wounds. We also note that Washington misidentified the .9-millimeter pistol he allegedly used, identifying a pistol which the State's firearms expert testified was "absolutely not" the gun from which the recovered bullet was fired. The jury was also aware that at his arrest, Washington stated that he "did not know" the victims, in direct contrast to his trial testimony. So also Washington's testimony that Davis was not present was rejected by the jury.

We hold that Washington's impeached testimony alone is insufficient to lead to a conclusion that the case was "factually close" with regard to whether the shootings were committed in self-defense. Under the circumstances of this case, we do not believe the trial court's failure to give IPI Criminal No. 24—25.06A as to one charge was a

serious error that "severely threatened the fundamental fairness" of defendants' trial, and, therefore, it did not constitute plain error.

## VI

■ Defendants argue next that they were deprived of a fair trial and due process of law by the State's alleged "suggestions to the jury that defendants were known criminals who deserved to be punished."

### A

Davis was initially charged with felony unlawful use of weapons because he was arrested in this case with a loaded weapon, and such arrest occurred within five years of his release from a penitentiary on a felony charge (Ill. Rev. Stat. 1981, ch. 38, par. 24—1(b)). After the jury was read this charge, which included Davis' prior conviction, the State's motion to nolle-prosse the charge was granted. Defendant contends he was prejudiced by the reading of this charge to the jury. In our opinion, this contention has been waived, as defendant did not move to sever this charge, did not object to reading the charge to the jury and did not allege this error in his post-trial motion. Even if we considered this issue, we would reject defendant's contention, because the State was required to prove the prior conviction to sustain the charge. (*People v. Tilden* (1979), 70 Ill. App. 3d 859, 388 N.E.2d 1046.) After the charge was nolle-prossed, no further mention of it was made to the jury, and we would find no prejudice to defendants.

### B

■ Defendants next contend that the State made repeated references to defendants' alleged gang membership, and such was done with the sole purpose of showing the jury that defendants were the types of persons deserving punishment. Defendants focus primarily on two instances. In the first instance, during defense counsel's cross-examination of a State investigator, he was asked various questions about the nature of the neighborhood where the shootings occurred. On redirect examination, noting that defense counsel had "attempted to qualify you as an expert on this particular neighborhood," the State asked the investigator about whether the area was inhabited by street gangs, and whether defendants were members thereof. The court sustained objections to the questions. We find the court's actions prevented any prejudice. *People v. Torres* (1977), 53 Ill. App. 3d 171, 368 N.E.2d 361.

Defendants complain about the State's redirect examination of Ms. Dates. During her cross-examination by defense counsels, Dates

was questioned closely about her ability to identify defendants, particularly Washington, whom she testified she had not seen before the night of the shootings. Similarly, she was extensively cross-examined with regard to her ability to identify defendants in light of her former psychiatric treatment, alleged drug abuse and admitted "hysterical" reaction to the shootings.

During the State's redirect examination, defense counsel objected to the State's asking Dates "what else" she knew about Washington. A side-bar conference was held, during which defense counsels stated that the question was too broad and would invite a prejudicial hearsay response. The court agreed with the State that the defense had repeatedly attacked Dates' identification of defendants, particularly focusing on her statements indicating a lack of familiarity with them, and allowed her to answer the question. She then stated "they" were members of the Black Gangster Disciples. On re-cross-examination, Dates admitted that her knowledge of defendants' alleged gang membership was based only on "rumor" from statements of "people on the street."

Defendant contends the question asking Dates "what else" she knew about Washington was an improper effort to prejudice the jury with testimony about defendants' gang membership. The State contends the question was proper, that defendants had opened the door to the question by their own cross-examination of her.

We do not find the question improper under the present circumstances. The scope of redirect examination is within the discretion of the trial court. (*People v. Davis* (1981), 92 Ill. App. 3d 426, 416 N.E.2d 69.) The court's ruling will not be reversed unless it is a clear abuse of discretion resulting in manifest prejudice to defendants. (*People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329.) It is clear that defendants considered Dates' identification to be a crucial issue. The trial court stated that it was in recognition of this that it allowed defense counsels "great latitude" in their cross-examination of her. We do not believe the court erred in then allowing the State an opportunity to further question her as to the basis of her identification. While her answer did include the reference to gang membership, which is generally an improper subject (see *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238), the totality of the circumstances leads us to conclude that any error was here harmless. First, we note defense counsel had previously asked Dates the same question here complained of. Second, we believe Dates' testimony on re-cross-examination wherein she admitted her statement was based only on "rumor" and from "persons on the street," substantially lessened

any prejudice to defendants. We find no abuse of discretion nor any manifest prejudice to defendants as a result of this reference to a street gang. See *People v. Perez* (1981), 94 Ill. App. 3d 377, 418 N.E.2d 969.

## C

■ Defendants contend the trial court erred in permitting the State to admit into evidence three weapons which were in the possession of defendants when they were arrested, although no connection was established between the weapons and the crimes charged. A sawed-off rifle, a shotgun and a .30-caliber rifle were admitted over defendants' objections. Four handguns were also admitted, to which no objection is made.

The State submits that the weapons were properly admitted as (1) demonstrative of "defendants' consciousness of guilt"; (2) relevant to the circumstances of defendants' arrests; and (3) relevant to defendants' "flight." We believe that only the State's second contention has support in the law. There are two lines of cases with regard to this issue. One line holds proper the admission of guns or other items of physical evidence seized at defendant's arrest as relevant to the "details of the arrest." (See *People v. Kincy* (1982), 106 Ill. App. 3d 250, 435 N.E.2d 831; *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529; *People v. Moore* (1969), 42 Ill. 2d 73, 246 N.E.2d 299.) Other cases hold the items inadmissible because they have little probative value and serve only to prejudice the defendants. (See *People v. Sanders* (1978), 59 Ill. App. 3d 650, 375 N.E.2d 921; *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528.) We believe that in the present case the shotgun and rifles could properly be admitted as evidence of the circumstances of defendants' arrests. Because the three defendants were arrested in each other's company shortly after the crimes, and one of the rifles was allegedly used to threaten the pursuing police, and the rifles were found with the handguns which were, according to defendants, those used at the shootings, we believe the three rifles were relevant to defendants' arrests which, here, were "closely and inextricably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances ***." (*People v. Olivas* (1976), 41 Ill. App. 3d 146, 150, 354 N.E.2d 424.) In light of the proper admission of four handguns recovered at defendants' arrests, even if we found the three rifles improperly admitted, we would find no prejudice resulting to defendants. *People v. Rickard* (1981), 99 Ill. App. 3d 914, 425 N.E.2d 1317.

## D

■■ Prior to Washington's testifying, the court denied his motion *in limine* to exclude evidence of his two prior misdemeanor convictions for unlawful use of weapons. Thereupon, during direct examination, he admitted that he had been so convicted in 1977. Defendant contends this was improper impeachment. We agree but find no reversible error. In Illinois, conviction for a crime is proper impeachment only if the crime is punishable by death or imprisonment in excess of one year or involved matters of dishonesty or false statements. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) These two convictions were in neither category. We do not find, however, that the use of these convictions prejudiced defendant. The jury was instructed that such evidence was admitted only on the issue of his credibility. We do not believe the admission of this evidence contributed to defendants' convictions and we consider the error harmless. *People v. Steele* (1984), 124 Ill. App. 3d 761, 464 N.E.2d 788; *People v. Bynum* (1981), 102 Ill. App. 3d 461, 430 N.E.2d 110.

## VII

■■ Defendants next contend they were denied a fair trial because of allegedly improper statements made by the State. In the first situation, during the cross-examination of Washington, he became confused as to which of the two .9-millimeter pistols recovered from defendants he allegedly used to shoot the victims. The prosecutor advised him not to "look over there for signals; look at me." The court sustained an objection to the word "signals." Secondly, the defendants complain of aspects of the State's closing argument wherein the prosecutor stated that defendant's defense was to "dirty up" the victims and make them "the bad guys" and then enumerated why defendants had no other defenses available in light of the overwhelming evidence against them. The final dispute revolves around the cross-examination of defense witness Michael Williams, who had stated that he was represented in a pending case by the same attorney representing defendant Spencer in the present case. The State then asked Williams if his attorney had put any pressure on him to testify on Spencer's behalf, and whether his testimony in the instant case was part of any deal between Williams and his attorney.

We find that defendants have waived the majority of these arguments by failing to object at trial and failing to include them in their post-trial motions. (*People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525.) Even were we to consider them, we would find no error. The remarks complained of were appropriate inferences from the evi-

dence. (*People v. Kester* (1979), 78 Ill. App. 3d 902, 397 N.E.2d 888.) We believe the questions by the State were proper except for the reference to "signaling," and any prejudice from the use of that word was cured by the court's sustaining of defendant's objection thereto. (*People v. Seider* (1981), 98 Ill. App. 3d 175, 423 N.E.2d 1217.) We therefore find no error.

## VIII

■■■ Defendants posit that they were deprived of a fair trial when the State was permitted to elicit evidence of a prior consistent statement from Cox. During Cox's direct examination, after he identified defendants as his assailants, he testified over defendants' objections that at the scene of the crime he had also identified defendants as his assailants. The trial court agreed with the State that Cox's prior consistent statement was admissible as an "excited utterance."

An excited utterance, an exception to the hearsay rule, must meet three criteria to be admissible; (1) it must result from a startling occurrence; (2) be made without time to fabricate; and (3) relate to the occurrence. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 434 N.E.2d 395.) Whether the second element was here met is in our opinion a close question: Although the time between the shootings and Cox's statement was only 10 minutes and he was severely wounded at the time, it is also true that during that same interval he made a telephone call and went up to the third-floor apartment. It is recognized that a trial court has wide discretion in determining whether a statement satisfies the criteria for an excited utterance, and the court's determination will only be reversed when it abuses that discretion. (*People v. Cherry* (1980), 88 Ill. App. 3d 1048, 411 N.E.2d 61.) The court here, after considering the evidence surrounding Cox's statement, determined that Cox's statement identifying defendants was made without time to fabricate and thus deemed it admissible as an excited utterance. We do not believe the court abused its discretion.

## IX

■■■ Defendants next argue that they were denied a fair trial when the State in losing argument asserted facts not based on the evidence. The prosecutor there stated that Dates "went bonkers" because of these shootings. During cross-examination, Dates had admitted that she underwent in-patient psychiatric treatment after she had attempted suicide "last year." When defense counsel asked her why she had attempted suicide, the State successfully objected that such information was irrelevant. Defendant therefore argues that the

State's contention that the shootings had caused Dates' psychiatric problems was not based on the evidence.

While we agree that the prosecutor's statement to the jury was not based on the evidence, nor, as the State now argues, on inferences from the evidence, we do not believe this improper remark requires a new trial. The trial court, following defendant's objection to this comment, instructed the jury to "disregard" any misstatements of the evidence by counsel. We do not believe that the remark was a material factor in defendants' convictions, nor that defendants were prejudiced thereby. *People v. Smylie* (1981), 103 Ill. App. 3d 679, 431 N.E.2d 1130.

## X

■■■ Davis contends that he was denied the effective assistance of counsel because his counsel failed to file a written post-trial motion, presenting instead only an oral motion. Davis argues that this alleged incompetence requires this court to review all allegations of error, notwithstanding any determination of waiver due to the failure to file a written post-trial motion.

Counsel for Davis made an oral post-trial motion, to which the State did not object but, instead, responded. "It is firmly established, however, that an oral motion is sufficient unless the State objects and requests that the grounds be specified. [Citations.] Here the State did not request that the grounds be specified; therefore, the oral motion is sufficient and all errors are preserved for appeal that were otherwise properly preserved." (*People v. Evans* (1982), 104 Ill. App. 3d 598, 602 n.1, 432 N.E. 2d 1285.) We have therefore reviewed Davis' allegations of error, including those not preserved at trial, and find none which would mandate a new trial.

## XI

■■■ Davis argues that his right to due process was violated when, at the sentencing hearing, the court allowed a police investigator to testify with regard to Davis' alleged position of leadership in the Black Gangster Disciples street gang. This testimony was admittedly based solely on information which the investigator had received from an unnamed informant. Defendant, while conceding that a sentencing court has authority to consider evidence of misconduct by defendant from which no prosecution or conviction has resulted, contends that the court must first insure that such evidence is accurate and reliable. Defendant states that the investigator's testimony here was demonstrated to be both inaccurate and unreliable and therefore

should not have been considered by the court. We agree.

While it is true that a sentencing court has wide discretion in the source and types of evidence to be considered in fashioning an appropriate sentence, it is equally true that the court has an obligation to exercise care that such information is accurate. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) It is uncontradicted that the investigator's testimony here was based completely on reports from an unnamed source. There was no showing whatsoever that the informant was reliable, or that his information was accurate. It also appears that the sentencing court was probably influenced by the investigator's testimony, since he noted, *inter alia*, a duty to protect the public from "gangsters." Thus, upon remand and at the new sentencing hearing, the court should not consider such information until the court is first able to determine its accuracy and reliability.

## XII

■■■ Davis and Spencer were sentenced to extended terms on their convictions for murder, armed robbery and attempted murder. They contend both that there was no basis in the record to support the court's imposition of extended terms, and that in any event a sentencing court is empowered by statute to impose only a single extended term, and that for the most serious offense for which a conviction is entered.

### A

Defendants, relying on *People v. Freeman* (1982), 104 Ill. App. 3d 980, 433 N.E.2d 974, and *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, argue that a sentencing court may not impose multiple extended terms. It is defendants' position that a sentencing court is empowered only to impose an extended term "for the most serious offense for which the offender is convicted." We do not agree. In *People v. Mims* (1982), 111 Ill. App. 3d 814, 444 N.E.2d 684, we held that when the sentencing court determines that the statutorily required aggravating factors are present, multiple extended terms may be imposed. See also *People v. Jordan* (1983), 114 Ill. App. 3d 16, 448 N.E.2d 237.

### B

■■■ Spencer and Davis further contend that the trial court erred in imposing extended sentences on them because none of the statutory conditions precedent for imposition of extended sentences were here present.

In Illinois, an extended term may not be imposed unless the trial court finds that the defendant has been previously convicted of the same or greater class felony within 10 years, or that the most serious offense for which a conviction has been entered was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—2 and 1005—5—3.2(b).) Because at trial it was conceded that neither defendant had been previously convicted of murder within 10 years, the issue remaining is whether the trial court could properly find that defendants' conduct was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

We first note that in *People v. Smallwood* (1984), 102 Ill. 2d 190, 464 N.E.2d 1049, the supreme court held that in determining whether a defendant's conduct was such that an extended term could be imposed, the sentencing court was not required to examine only the conduct immediately giving rise to the "most serious offense" but could look to the defendant's conduct throughout the criminal transaction.

> "The defendant would have us narrowly define and distinctly separate the various offenses that arose out of defendant's conduct. He argues that at the time the defendant took the money from Adams the armed robbery was completed ***, and that the violent conduct which followed did not accompany the more serious crime of armed robbery. *** However, the act of the robbery itself has not necessarily been completed at the time the victim surrenders the property so that no further consequences will attach to the robber's conduct subsequent to the surrender of the property. For example, this court has held that when a killing is committed in the course of an escape from a robbery, each of the conspirators is guilty of murder under the felony-murder statute *** 'inasmuch as the conspirators ha[ve] not won their way to a place of safety.' [Citations.]
>
> *** However, we do not agree with the defendant that the offenses of armed robbery and aggravated battery, which arose out of defendant's conduct, can be so narrowly defined or distinctly separated as to say that the shooting of Adams by the defendant did not *accompany* the armed robbery, but instead related only to the lesser offense of aggravated battery. In many instances the exceptionally brutal or heinous behaviour necessary to authorize the imposition of an extended-term sentence will itself constitute another separate offense, as in this case. The fact that the defendant may be indicted for and convicted of such other offense should not insulate him from the

imposition of the extended-term sentence for the basic offense.
***

*** We conclude, as did the appellate court, that the acts which constituted the aggravated battery accompanied the armed robbery and were inseparably linked thereto. ***

In our case, the indictments charging aggravated battery were based on the defendant's shooting of Adams. Thus, the facts which constitute the aggravated battery form the basis for the imposition of the extended-term sentence for the armed robbery." (102 Ill. 2d 190, 194-96.)

We believe this holding to be relevant here. The trial court, in determining whether defendants' conduct was wanton, could properly consider not only the "greater" offense of shooting Leaks, but defendants' actions in holding and shooting Cox, robbing them both, and then threatening to shoot Dates. In considering this conduct, we find no abuse of the court's discretion in imposing extended sentences. We note, in light of this court's vacatur of the murder convictions, Davis' conviction here of armed robbery would appear to support an extended term insofar as the record indicates he has been previously convicted of that offense within 10 years.

## XIII

In their final argument, defendants allege that various convictions were improperly imposed for offenses based on the same act or for lesser included offenses. They note that the mittimus reflects convictions for three counts of murder, although there was only one victim. They also allege that they should have been convicted of only one robbery, and not two, because the robberies were "simultaneous" and that the aggravated battery convictions should be vacated because they are lesser included offenses of attempted murder.

The State agrees only that the aggravated batteries should be vacated, as being lesser included offenses of attempted murder.

We agree that defendants' convictions for aggravated battery convictions should be vacated since they are lesser included offenses of the attempted murder convictions and both offenses were based on the shooting of Cox. *People v. Comacho* (1979), 71 Ill. App. 3d 943, 389 N.E.2d 1213.

We also agree that because only one victim was killed, defendants' mittimus should be amended to reflect but one voluntary manslaughter conviction. *People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795.

We do not believe that one of the armed robbery convictions must

be vacated. Contrary to defendants' assertion, there was not one robbery of two victims as in *People v. Palmer* (1982), 111 Ill. App. 3d 800, 444 N.E.2d 678. Rather, defendants here were convicted of having robbed both Leaks and Cox, and thus their two armed robbery convictions each are affirmed.

Therefore, at the new sentencing hearing, the court should impose sentences on each defendant for one count of voluntary manslaughter, two counts of armed robbery, and one count of attempted murder. For the reasons stated herein, defendants' convictions for those offenses are affirmed, the aggravated battery convictions are vacated and this cause is remanded for a new sentencing hearing for each defendant.

Affirmed in part; reversed in part; remanded.

STAMOS and DOWNING, JJ., concur.