THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID PHILLIPS, Defendant-Appellant.

Third District   No. 3—85—0768

Opinion filed May 29, 1987.—Modified on denial of rehearing September 1, 1987.

484

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Erik I. Blanc, State's Attorney, of Pekin (Terry A. Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Following a jury trial, the defendant, David Phillips, was found guilty of aggravated kidnapping and one count of aggravated criminal sexual assault. He was sentenced to concurrent extended prison terms of 40 years for the aggravated criminal sexual assault and 25 years for the aggravated kidnapping. The defendant appeals. We affirm.

The evidence tended to establish that at approximately 10:30 p.m. on June 8, 1985, the victim's mother and a friend, Harold Jackson, were out on the front porch of the mother's home in North Pekin. The victim, aged two years and nine months, and her nine-year-old brother had fallen asleep on the living room couch. The victim was wearing a pale yellow nightgown. The mother checked on her children at about 11 p.m. and then again shortly before midnight.

At around midnight, the defendant drove up to the residence in a dark-colored Maverick. According to the mother, the defendant was a casual acquaintance, having been at her home three or four times previously. After a brief conversation with the mother and Jackson, the defendant asked to use the bathroom. The defendant entered the residence through the front door. A short time later, the mother and Jackson heard the back door slam; Jackson observed a person carrying a white object away from the house, toward the garden. A few minutes later, the mother heard the back door slam again. The defendant reappeared via the front door, talked with the pair for a few moments, and left.

About 5 to 10 minutes after the defendant's departure, the mother discovered that her daughter was missing. The police were called, volunteers were gathered, and a massive search for the victim commenced.

Jeffrey LaSee was staying at a residence in North Pekin on the night in question. At an early morning hour he noticed lights and looked outside. He saw some squad cars pass by. LaSee observed a dark-colored Maverick nearby on Roosevelt Street. As the Maverick's driver's door opened, LaSee saw a small, naked child placed out of the car onto the street. The car then speeded away from the scene and searchers picked up the child.

Volunteer searcher Bruce Cool retrieved the completely nude victim near the area where LaSee observed the parked Maverick. He later recovered the victim's nightgown from the same area.

The mother took the victim to the hospital. The examination revealed redness in and around the vaginal area but no indication of penetration. The outside of the anal area appeared red and the inner portion was grossly enlarged. Also, seminal material was obtained from a rectal swab.

The following day, June 9, the mother noticed that the victim was acting strangely. She would not eat, was not playful, and would not smile. She also complained of pain and would not sit in her bath. At approximately 5:30 that afternoon, the victim's brother made a statement to the mother about a friend of his named "David," not the defendant. Upon hearing the name, the victim responded: "David bad. David bad. Pushed out of car. Wanna go home. Rocks hurt my feet. Wanna go home."

According to the defendant's statement, he had been working until 11:30 p.m. on June 8. The defendant stopped at the mother's residence at about midnight, thinking that his brother and sister-in-law might be there. After talking briefly with the mother and a male subject, the defendant asked to use the bathroom. On his way out, he noticed the victim and her brother, for whom he had babysat twice, lying on the couch. He then left and arrived at his brother's house at about 1 a.m. The defendant denied both exiting the mother's residence through the back door that night and molesting or abducting the victim.

Randy and Connie Phillips, the defendant's brother and sister-in-law, testified that, although the defendant had been staying at their residence, he had no house key. On the night in question, the defendant was not home when they went to bed at approximately 11 p.m. At around 3 a.m., they were awakened by the defendant's efforts to awaken someone to let him into the house.

Patricia Orr, a serology specialist with the Illinois State Police, testified to a number of tests she had performed. From the test results, she determined that the defendant was among the statistically recognized 3% of the total population of blacks and whites who are type AB secretors. She also determined that the seminal material found on the victim's vaginal and rectal smears, as well as a stain found on the victim's nightgown, came from an AB secretor. Orr concluded that the seminal material found could have originated from the defendant.

Orr also testified that a head hair found between the bucket seats

of the defendant's vehicle was consistent with a head hair sample taken from the victim. Orr further stated that pubic hairs found on the victim's nightgown were consistent with the defendant's and fibers found on the nightgown were consistent with fibers taken from the carpeting of the defendant's car.

On appeal, the defendant's first issue is whether he was denied a fair trial by the admission of expert testimony concerning the percentage of AB secretors in the population. The defendant argues that the instant statistics tended to distract the jury from the ultimate question in the case: the identity of the actual offender. The defendant argues that the statistics neither reveal who the actual attacker was nor equate with a 3% chance that the defendant is innocent. The defendant also argues that in its closing argument, the State improperly used the statistics to suggest that the group of individuals who could have been responsible for the attack on the victim was less than 1½% of the population when women and nonejaculating males were excluded from the AB secretor group. Finally, the defendant cites a number of law review articles to support his contention that police forensic laboratories are unable to do accurate blood typing.

■ Initially, we observe that the State moves to strike the defendant's law review article references as they were not as evidence properly presented in the trial court. Evidence that is not made part of the record will not be considered by the reviewing court and the relevant portion of the brief may be stricken. (*People v. Gossage* (1980), 80 Ill. App. 3d 36, 399 N.E.2d 334.) We allow the State's motion to strike that portion of the defendant's brief which relates to newly raised evidentiary matters.

In his argument regarding the admission of statistical evidence regarding AB secretors, the defendant relies primarily on *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734. In *Harbold*, the State's expert witness testified that, based on the characteristics of the blood samples taken from the victim, the defendant and the scene of the homicide, the probability of an accidental match between the defendant's blood and blood samples taken from the scene was less than 1 in 500. On review, the appellate court held that the trial court erred in admitting the testimony regarding the statistical probability of matching blood because of a lack of foundation and because it encouraged the jury to focus "unfairly upon a numerical conclusion." (124 Ill. App. 3d 363, 383, 464 N.E.2d 734, 749.) Because *Harbold* involved a close circumstantial case, the cumulative effect of this error and three other errors was deemed sufficient to warrant a new trial.

In another blood-type characteristics case, *People v. Alzoubi*

(1985), 133 Ill. App. 3d 806, 479 N.E.2d 1208, an expert tested the defendant, who was charged with indecent liberties with a child, and the child of the victim. The expert testified that each had one of the rarest HLA blood-type characteristics. The expert stated that if the defendant had access to the victim, and if he was fertile, the probability was 99.7% that he was the child's father. The expert further stated that only six men out of a thousand in a random group of Caucasian males would have had the instant blood-characteristic combination and that the defendant was 335 times more likely to be the biological father than a randomly drawn North American male. On cross-examination, the expert admitted that the test results could not identify the biological father and that the tests would exclude 99.7 of 100 falsely accused men.

In affirming the admission of the above evidence, this court distinguished *Harbold*. First, unlike in *Harbold* where the only evidence linking the defendant to the crime was a blood-characteristics match, in *Alzoubi* the blood characteristics corroborated the victim's positive identification of the defendant as the father of the child. Second, the *Alzoubi* expert made it clear that the probability statistics would apply only if the defendant had access to the mother and was fertile, that the tests could not name the father, that there remained a doubt as to the defendant's paternity, and that the tests merely indicated that the defendant could not be excluded.

As in *Alzoubi*, we find *Harbold* to be distinguishable here. Orr merely testified that based on well-recognized statistics, the defendant's blood type fell within a group that consisted of 3% of the total population. She never testified as to the probability that the semen recovered from the victim was from the defendant. On cross-examination, Orr admitted that she could not testify that the semen came from the defendant, but only that he was in a group of the total population capable of donating that seminal material.

Further, assuming *arguendo* that the blood-type testimony was inadmissible, the remaining evidence against the defendant, albeit circumstantial, was simply overwhelming. The defendant had access to the victim's home. A short time later, a car matching the defendant's was seen discarding the naked victim. Also, the hair and carpet fiber evidence was consistent with the defendant's guilt. Lastly, the victim gave a statement to her mother implicating "David" as the person who deposited her from the automobile. Consequently, we find that the admission of the instant expert testimony did not prejudice the defendant.

As to the prosecutor's closing remarks, we find that the jury,

through a simple mathematical calculation, could have reasonably inferred what the prosecutor suggested: after excluding women and nonejaculating males, the percentage of AB secretors who could have donated the semen found on the victim was 1½% or less of the total population. (See *People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272.) We find no error.

As to the defendant's contention that the police lab blood-typing tests are generally unreliable, we observe that the tests employed by Orr, the ABO blood typing and the PGM typing systems, have been held to be admissible as relevant to identification; any challenge to their reliability goes to the weight of the evidence and not to admissibility. *(People v. Redman* (1985), 135 Ill. App. 3d 534, 481 N.E.2d 1272.) The trial court found that the evidence was relevant and admissible. Given the totality of the evidence, we conclude that the trial court did not err.

The defendant's second issue is whether the trial court erred in admitting the victim's statement concerning "David" under the spontaneous declaration exception to the hearsay rule. The defendant argues that because the statement was made by the 2½-year-old victim 15 to 17 hours after the incident occurred, she had sufficient time for reflection and therefore the statement was not spontaneous. The defendant asserts that the victim's behavior on the day following the incident did not appear unusual for a child nor did it suggest that she was under stress caused by the incident. The defendant also argues that the victim's declaration was not in response to a general question but was a product of her brother's mentioning the name "David" and that the victim could have been referring to anyone named "David."

To bring a statement within the spontaneous declaration exception to the hearsay rule, three factors are necessary: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) a relation between the statement and the circumstances of the occurrence. *(People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.) The trial court has considerable discretion in determining whether a statement is admissible as a spontaneous declaration; and its decision will not be reversed absent an abuse of that discretion. *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285.

Elapsed time alone does not control the admissibility of a statement as a spontaneous declaration. The critical factor is the opportunity to fabricate. *(People v. Sanchez* (1982), 105 Ill. App. 3d 488, 434 N.E.2d 395.) The trial court must look to the surrounding circumstances to determine whether there was an opportunity for reflection

and invention. *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292.

This court has recognized that the stress of a sexual assault upon a child will remain with the child long after it occurred and that the child's statements will be unfabricated for three reasons: (1) the child is apt to repress the incident; (2) it is often unlikely the child will discuss such a stressful incident with anyone but the mother; and (3) the characteristics of young children work to produce declarations free of conscious fabrication for a longer period after the incident than adults. *People v. Bitler* (1986), 146 Ill. App. 3d 477, 497 N.E.2d 137.

In *Bitler*, the two female victims, aged five and three, were awakened during the night by their mother, who had become suspicious that someone had been molesting her children. In response to their mother's questions, each child indicated that she had been molested. The trial court permitted the mother to repeat the children's answers at trial. On appeal, this court upheld the admission of the children's statements as spontaneous declarations, even though the time lapse between the declarations and the molestation may have been as long as 24 hours. We found that the victims had both insufficient time and, in light of their extreme youth, opportunity to fabricate their statements.

■ As the victims in *Bitler* we find that the instant 2½-year-old victim had neither the time nor the motive or opportunity to fabricate her statement. The defendant's suggestion that the victim's behavior on the day following the incident was not unusual is completely contradicted by the mother's testimony that the victim was not acting normally. The fact that the victim uttered her statement at the mere mention of the name "David," and not in response to even a general question, is further indication of its spontaneity. That the statement was made 15 hours after the incident occurred does not diminish that spontaneity. The stress caused by the defendant's acts would have lingered long after the acts themselves were committed. (*People v. Bitler* (1986), 146 Ill. App. 3d 477, 497 N.E.2d 137.) We find that the trial court properly admitted the victim's statements as spontaneous declarations.

The defendant's third issue is whether the defendant's cause must be remanded for resentencing because the trial court improperly imposed an extended-term sentence for both convictions. The defendant notes that convictions for either criminal sexual assault or kidnapping may be enhanced to an aggravated offense if the victim is under 13 years of age. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(b)(1), 10—2(a)(2).) He also notes that a defendant may be sentenced to an ex-

tended term if his victim is under 12 years of age. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)(i).) The defendant thus argues that applying the above extended-term provision to a defendant convicted of either aggravated criminal sexual assault or aggravated kidnapping, where the offenses were aggravated because the victim was under 12 years of age, constitutes a constitutionally impermissible double enhancement. The defendant relies on *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, for the proposition that a factor implicit in the crime, such as the victim's age here, cannot be considered as an aggravating factor in sentencing.

In *Conover*, the court held that a factor necessarily implicit in burglary, receiving compensation for the taking of the proceeds, could not be utilized as an aggravating factor in sentencing under section 5—5—3.2(a)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(2)). The court's rationale was that the legislature likely considered that factor in establishing the penalty for burglary.

However, we find *People v. Brewer* (1984), 127 Ill. App. 3d 306, 468 N.E.2d 1242, to be closer to the instant case. In *Brewer*, the defendant was sentenced to an extended term for indecent liberties with a child. The victim was seven years old at the time of the offense. On appeal, the defendant presented essentially the same argument as in the instant case. There, the court noted that the legislature has wide discretion in classifying offenses and prescribing penalties. The court reasoned that in enacting section 5—5—3.2(b)(3)(i), the legislature determined that felonies committed against children under age 12 were of a greater harm to society than those committed against children over 12 and thus deserved a harsher penalty. The court held that the trial court at sentencing did not err in considering in aggravation the extreme youth of the victim.

■ Similarly, we believe that the legislature has determined that a person who has committed an aggravated criminal sexual assault or aggravated kidnapping against a child 11 years old or under deserves a stricter sentence than a defendant committing the same crimes involving victims between the ages of 12 and 13. We therefore hold that it was not error for the trial court to impose an extended-term sentence, considering in aggravation the fact that the victim was 2½ years old.

■ The defendant's fourth issue is whether his extended-term sentence for aggravated kidnapping must be modified because he was also convicted for aggravated criminal sexual assault, a Class X felony. The defendant argues that he cannot receive an extended-term

sentence for the Class 1 felony of aggravated kidnapping where that offense was not the most serious of which he was convicted. The State argues that the defendant has waived this issue for failure to raise it at sentencing. We, however, choose to address the issue. 87 Ill. 2d R. 615(a).

■■ When a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may be imposed only for the conviction of the most serious class. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a); *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) Thus, we find that the extended-term sentence imposed for the defendant's aggravated kidnapping conviction, a Class 1 felony, was improper. Aggravated kidnapping did not belong to the most serious class of offense for which the defendant was convicted, namely, Class X, for the felony of aggravated criminal sexual assault.

We need not remand for resentencing, however. From the record, it is clear that the trial court intended to heavily punish the defendant for his actions. Therefore, pursuant to Supreme Court Rule 615(b)(4) (87 Ill. 2d R. 615(b)(4)), we reduce the defendant's sentence for aggravated kidnapping to the 15-year, maximum non-extended term of imprisonment.

■■ The defendant's final issue is whether the trial court improperly imposed excessive sentences against the defendant given his lack of a prior adult criminal record, his youth, his rehabilitation potential, and his psychological problems. The 20-year-old defendant argues that this was his first offense as an adult and that he was never before incarcerated. The defendant also argues that there was a lack of severe bodily injury in this case. The defendant lastly contends that he suffers from mental illness and was himself sexually abused when he was six years old.

A sentence will not be reversed on review absent an abuse of discretion by the trial court. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) In the case at bar, although this is the defendant's first adult conviction, he was adjudicated a juvenile for a 1981 home invasion and battery in which he broke into a woman's home at night, pulled a knife on the woman, and tried to force her into a car. Also, at the time of the instant offense the defendant was on probation for a 1983 misdemeanor theft. Most importantly, the defendant committed a grave offense against a very young, trusting, and impressionable child. The crime committed by this defendant was beyond outrageous. We find no abuse of discretion.

Accordingly, the defendant's convictions for aggravated criminal sexual assault and aggravated kidnapping are affirmed; the defend-

ant's extended-term sentence for aggravated kidnapping is modified to a concurrent 15-year term of imprisonment.

Affirmed as modified.

STOUDER and SCOTT, JJ., concur.